IONA K. SEEFELDT *et al.*, Plaintiffs-Appellants, v. THE MILLIKIN NATIONAL BANK OF DECATUR *et al.*, Defendants-Appellees (Jack Wyse *et al.*, Defendants).

Fourth District No. 4—86—0662

Opinion filed April 13, 1987.

716

Robert D. Owen and Linda M. Castleman, both of Owen, Roberts, Parish, Castleman & Owen, Ltd., of Decatur, for appellants.

Michael I. Campbell, of Hull, Campbell & Robinson, of Decatur, for appellee Millikin National Bank of Decatur.

Frank H. Byers, of Byers, Byers & Greenleaf, Ltd., of Decatur, for other appellees.

JUSTICE LUND delivered the opinion of the court:

Plaintiffs brought this action to recover damages which they claim to have sustained as a result of defendants' fraud and conspiracy to defraud. Three of the defendants, the Millikin National Bank of Decatur (the Bank), Jerry Skeffington, and Robert Skeffington, filed motions for summary judgment. The motions were granted, and the circuit court of Macon County entered judgments in defendants' favor. Also, the court made a finding pursuant to Supreme Court Rule

304(a) (103 Ill. 2d R. 304(a)) that no just reason existed for delaying enforcement or appeal. Plaintiffs appeal.

In a prior appeal, we reversed the lower court's order granting defendants judgment on the pleadings pursuant to section 2—615 of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 2—615). (*Seefeldt v. Millikin National Bank* (1985), 137 Ill. App. 3d 841, 485 N.E.2d 30.) In that appeal, we held that the lower court had granted defendants' motion with the improper assistance of additional discovery material, namely, certain depositions. We determined that such assistance was improper on motions for judgment on the pleadings. We made no determination regarding the evidence outside of the allegations in plaintiffs' first amended complaint. On remand, the Bank and Jerry and Robert Skeffington filed motions for summary judgment. In order to decide this appeal, we must discuss in more detail the allegations in the complaint and the supporting material in the record.

Plaintiffs' first amended complaint, filed on October 22, 1984, alleged that Jerry Skeffington, Robert Skeffington, Warren Hagen, John James Malloy, and Wayne B. Phillips were joint venturers in "Big I, Inc." (Big I), a real estate development venture. The Bank provided financing for Big I, but in so doing, the Bank required the personal guarantees of all the shareholders. The Bank also held a trust in which the Seefeldts were beneficiaries. Plaintiffs further allege that from early May 1980, Big I was unable to make the required interest payments on its obligation to the Bank. By late 1980, Warren Hagen was having financial difficulties. Jerry Skeffington and Robert Skeffington, knowing of the financial difficulties of Big I, and being advised by Hagen of his financial problems, were desirous of ending their participation in the venture and terminating their potential liability to the Bank. Plaintiffs contend that defendants did conspire to commit fraud and did commit fraud by convincing plaintiffs to take over Jerry and Robert Skeffington's interests in Big I and to replace the Skeffingtons as guarantors on the Big I indebtedness to the Bank. On April 8, 1981, the Skeffingtons transferred their interest in Big I to Seefeldts. At the same time, Seefeldts replaced Skeffingtons on the Bank indebtedness, and Skeffingtons paid Seefeldts $95,000. The Bank eventually took judgment on the indebtedness, and because of the limited financial resources of the other guarantors, Seefeldts appear to be the principal sureties.

The Bank and both Skeffingtons answered the complaint, denying fraud and conspiracy to commit fraud. After discovery, the three defendants filed motions for summary judgment, arguing that they were entitled to judgment as a matter of law.

 The sole issue is whether the court should have granted summary judgments in favor of the Bank and Jerry and Robert Skeffington. Section 2—1005 of the Code of Civil Procedure (Ill. Rev. Stat. 1985, ch. 110, par. 2—1005) sets forth the procedure for summary judgments, and provides in part:

"(b) For defendant. A defendant may, at any time, move with or without supporting affidavits for a summary judgment in his or her favor as to all or any part of the relief sought against him or her.

(c) Procedure. The opposite party may prior to or at the time of the hearing on the motion file counteraffidavits. The judgment sought shall be rendered without delay if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and· that the moving party is entitled to a judgment as a matter of law."

It is well established that the summary judgment procedure is an important tool in the administration of justice, and its use in a proper case is to be encouraged because its benefits inure not only to the litigants in the saving of time and expenses, but to the community as well in avoiding congestion of trial calendars and the expenses of unnecessary trials. (*Martin v. 1727 Corp.* (1983), 120 Ill. App. 3d 733, 736, 458 N.E.2d 990, 992.) In reviewing the order· for summary judgment, this court must consider all of the facts revealed in the record and all of the grounds alleged by the parties in order to determine whether a genuine issue as to a material fact does still exist. (*Casteel v. Smith* (1982), 109 Ill. App. 3d 1094, 1098, 441 N.E.2d 860, 863.) Summary judgment is proper when the matters properly before the court show that if the case goes to trial, there would be no question the trier of fact would be required to decide and the movant would be entitled to judgment as a matter of law. (*Scheff v. Fort Dearborn Life Insurance Co.* (1986), 148 Ill. App. 3d 77, 80, 499 N.E.2d 78, 80.) The trial court must construe any evidence in support of the motions strongly against the movant and liberally in favor of the opponent. (*Stringer v. Zacheis* (1982), 105 Ill. App. 3d 521, 522, 434 N.E.2d 50, 52.) Even though a complaint may purport to raise an issue of material fact, if such issue is not further supported by evidentiary facts, summary judgment is appropriate. (*Harrington v. Chicago Sun-Times* (1986), 150 Ill. App. 3d 797, 801, 502 N.E.2d 332, 334.) In determining the genuineness of a fact, a court should ignore personal conclusions, opinions, and self-serving statements and consider only facts admissible in evidence under the rules of evidence. *Malawy v.*

*Richards Manufacturing Co.* (1986), 150 Ill. App. 3d 549, 571, 501 N.E.2d 376, 390.

■ In this case, the plaintiffs argue that defendants conspired to commit fraud against them and did commit fraud against them. In a civil conspiracy, the wrongful act alleged to have been done in pursuance of a conspiracy, and not the fact of the conspiracy itself, is the gist of the action for damages. (*Zokoych v. Spalding* (1976), 36 Ill. App. 3d 654, 667, 344 N.E.2d 805, 816.) As the alleged wrongful act in this case is fraud, we must focus on the evidence of fraud contained in the depositions, admissions, and affidavits in evidence to determine whether the summary judgments were properly granted.

■ The elements of fraud are: (1) a false statement of a material fact; (2) the party making the statement knew or believed it to be untrue; (3) that the party to whom the statement was made had a right to rely on it and did rely on it; (4) that the statement was made for the purpose of inducing the other party to act; and (5) that reliance by the person to whom the statement was made led to his injury. (*Redarowicz v. Ohlendorf* (1982), 92 Ill. 2d 171, 185-86, 441 N.E.2d 324, 331-32.) As stated above, one of the elements of a fraudulent misrepresentation is that the injured party justifiably relied on the false statement. In determining whether reliance is reasonable, courts look to all the relevant circumstances surrounding the alleged misrepresentation. (*Chicago Title & Trust Co. v. First Arlington National Bank* (1983), 118 Ill. App. 3d 401, 454 N.E.2d 723.) Generally, it is only where parties do not have equal knowledge or means of obtaining knowledge of the facts which are allegedly misrepresented that a person may justifiably rely on them. (*Central States Joint Board v. Continental Assurance Co.* (1983), 117 Ill. App. 3d 600, 606, 453 N.E.2d 932, 936.) A person may not enter into a transaction with his eyes closed to available information and then charge that he has been deceived by another. 117 Ill. App. 3d 600, 606, 453 N.E.2d 932, 936.

For the reasons hereafter stated, we affirm the trial court's order granting summary judgment to the three defendants.

Plaintiffs set forth five alleged misrepresentations upon which they relied: (1) defendants had falsely stated the Big I indebtedness to the Bank was current; (2) the reason Skeffingtons wanted out of the real estate venture was falsely given as ill health, and no mention was made of the poor financial status of the corporation or the other shareholders; (3) Seefeldts had received as an inducement the possibility of being able to participate in the purchase of Skeffingtons' Anheiser-Busch distributorship; (4) the defendants had failed to disclose the poor status of Warren Hagen's financial affairs; and (5) the

failure to disclose that Skeffingtons would pay $200,000 to remove themselves from the real estate venture, instead of the $95,000 that Seefeldts did receive.

We note that the pleadings, affidavits and depositions in the record establish that Iona Seefeldt did not participate in the negotiations for this transaction. Rather, she relied totally on her son, Jim. Therefore, any misrepresentation must appear in defendants' treatment of Jim Seefeldt. We first consider the allegations of misrepresentation as they apply to the Bank.

From our examination of the record, it is clear that the Seefeldts were not encouraged by the Bank to enter into the transaction. Lyle Roush was the Bank officer involved in this transaction. Jim Seefeldt stated in his April 12, 1984, deposition that he had not met Roush prior to the closing on April 8, 1981. Later, in his November 26, 1984, deposition, Seefeldt stated that he met Roush one to three weeks before April 8, 1981. He described that meeting by saying it "wasn't a long meeting." In answer to Seefeldt's "humorous" statement that he hoped the Bank would not foreclose on the Big I property, Roush answered that he did not see any foreseeable problem. Jim Seefeldt was asked if the Bank had discussed the financial condition of Hagen or Malloy. Seefeldt answered, "Mr. Roush never said anything about anything."

The record shows that the transaction Seefeldt seeks to set aside was not instigated by the Bank or Roush. The terms were not suggested by the Bank or Roush nor was any misrepresentation made about any facet of the transaction other than that Big I was current on its indebtedness to the Bank. Plaintiffs offered no evidence linking employees of the Bank with the encouragement or procurement of the Skeffingtons-Seefeldts transaction. Roush's deposition and that of the Bank president indicate the Bank had no reason to substitute Seefeldts for Skeffingtons. The Bank was satisfied with Skeffingtons as guarantors of the Big I indebtedness. The discovery material indicates the Bank had no knowledge of any of the alleged misrepresentations with the possible exception of the status of the debt.

■ A prospective buyer in a real estate development would be interested in certain relevant information, such as: (1) the value of the assets in the venture; (2) the anticipated income; (3) the market for the assets; and (4) the amount of the outstanding corporate debt. The plaintiffs contend the Bank made a misrepresentation by stating the Big I note was current. Jim Seefeldt's deposition refers to no other Bank representation. It is argued that the past history of adding interest to principal made the current status representation false. Plain-

tiffs do not dispute the amount of the note executed on April 8, 1981, was the correct corporate indebtedness. They do not deny knowing the amount of the note at the time of execution. No request was made to see the loan-payment record. The plaintiffs knew the debt evidenced by the note was principal, and the next interest payment was due in six months. We find the statement that the loan "was current" was not a false statement of a material fact. This was a statement as to the status of the debt at the time of the transaction, and no inference of falsehood can be drawn from the terminology. If Seefeldts were going to rely upon the past history of the note, then questions about the history should have been asked. No statements about the note history were made. Beyond this fact, Seefeldt himself testified that he made no further investigation into the financial attributes of the transaction. He did not seek information from Roush or the Bank. Neither did he consult an attorney or an appraiser. The testimony of Jim Seefeldt in his depositions establishes his failure to seek information. Regardless of the Seefeldts' desire to the contrary, the Bank was not their keeper and was not required to forbid or discourage them from making the investment. There is no genuine issue of material fact as to the allegations of fraud and conspiracy on the part of the Bank. The Bank was entitled to summary judgment.

We next turn to the Skeffingtons. Prior to Seefeldts replacing Skeffingtons as Big I shareholders and guarantors, the Skeffingtons had offered to pay the other Big I shareholders $200,000 to take over the Skeffingtons' interest in Big I. As a condition of this offer, Skeffingtons wanted to be removed as guarantors of the corporate debt. Skeffingtons were obviously concerned about the possible liability associated with Big I. Robert believed the worry concerning Big I was detrimental to brother Jerry's health. The offer by Skeffingtons was not accepted.

At a subsequent social gathering, Robert Skeffington indicated to Jack Wyse that the brothers would pay $200,000 to get out from under the Big I obligations. Wyse was a realtor and also the manager and part owner of the Ambassador Motel in Decatur. James Lambert, a Decatur-based certified public accountant, was told by Wyse that Skeffingtons would pay to get out of Big I. While Lambert did not personally know Skeffingtons and had not talked to them, he did seek out other parties who might be interested in taking over Skeffingtons' interest. Steve Horve, a home builder friend of Lambert's and a friend of Jim Seefeldt's, suggested Seefeldt as a possible party. In his depositions, Seefeldt indicated that he heard of the possible venture from Horve and then made contact with Lambert. According to the

depositions of all the parties, the terms of the Skeffingtons-Seefeldts agreement were determined in discussions between Lambert and Seefeldt. Wyse did obtain a plat of the Big I real estate and the Bank debt balance for Seefeldt's consideration. Wyse did not disclose Seefeldt's name to Skeffingtons, and neither Seefeldt nor Lambert had direct contact with Skeffingtons during the negotiation stage. The only contact with Skeffingtons which occurred during the negotiation stage was when Wyse obtained approval of the $95,000 payment that Jim Seefeldt required.

Robert Skeffington knew about Hagen's financial problems, but Wyse and Lambert denied having such knowledge when the transaction was being negotiated. Any evidence relating to Wyse and Lambert's knowledge of Hagen's problems is nothing more than speculation on Seefeldt's part.

Skeffingtons personally made no representations to Seefeldts. The contact between Skeffingtons, as shown by the depositions, was so minimal that it cannot be said that Skeffingtons made representations upon which Seefeldts could reasonably rely in deciding to enter the transaction. It clearly appears from the records that Skeffingtons perpetrated no direct fraud upon the Seefeldts. Therefore, liability against Skeffingtons must be found, if at all, based upon the conspiracy theory.

Under the conspiracy to defraud theory, Seefeldts must still show a false representation of a material fact. We have discussed the question of the allegedly incorrect status of the debt. Seefeldts were aware of the debt balance and the time of the next interest payment at the time they signed the note. Jim Seefeldt did not make an investigation of the history of the debt, and none was ever stated to him. There was no misrepresentation as to the status of the debt.

Jim Seefeldt was told by Lambert that Skeffingtons wanted out from the Big I debt for health reasons. Age, possible retirement, and being invested outside of their expertise were also discussed as reasons. Seefeldts have presented us no evidence that would indicate the untruth of these representations. Seefeldts claim the main reason Skeffingtons wanted to liquidate their interest was because of their concern about Big I's financial status. They argue that hiding this fact was a material misrepresentation. We know of no requirement that a vendor disclose his or her opinion as to the financial future of the property being sold. There were no representations made as to Big I's future profitability. The willingness of Skeffingtons to pay $95,000 indicated their concern about the value of the venture; parties do not usually pay to liquidate an investment. Seefeldts, in making their in-

vestment decision, requested little information, and were furnished everything requested. In his deposition testimony, Jim Seefeldt indicated an overriding desire to be involved in a real estate development. The record shows no misrepresentation as to Big I's financial condition. Rather, Seefeldt chose to rush in where angels fear to tread. He made a large investment without an adequate investigation of the facts and with a confidence in the future economic condition of the community which was not borne out.

Plaintiffs suggest defendants buttressed their statement that Skeffingtons wanted out of the venture for health reasons by adding that Skeffingtons might also liquidate their beer franchise. Jim Seefeldt, in his April 12, 1984, deposition, stated Lambert told him about the possible future purchase of the beer franchise. Seefeldt stated Lambert indicated something would develop in "probably six or eight months." This was based on "some strong insinuations because of [Skeffingtons'] health, I mean, to hear reported that they were almost on their death beds." Lambert's account emphasized the beer franchise investment was "kind of a hope-for situation if and when" but stated the two transactions were "never, never *** co-mingled [sic]." The record shows that any reference relating to the sale of the beer franchise was mere speculation and could not be reasonably relied on as an inducement to become a shareholder of Big I. There are no facts alleged on which to base a misrepresentation, only conjecture, and, perhaps, dreams of future opportunities.

The fourth alleged misrepresentation relates to Warren Hagen's distressed financial condition. Hagen's financial status was not discussed by Seefeldts with any of the defendants. At Lambert's suggestion, Seefeldts did talk to Hagen, who was Jim Seefeldt's next-door neighbor. He told Hagen that the Seefeldts were considering taking over Skeffingtons' interest in Big I. The record shows no more. Again, Seefeldts rely on conjecture. Seefeldts' contention that Wyse and Lambert must have known of Hagen's financial troubles and were obligated to bring this to their attention is nothing more than opinion and conclusion without foundation in the record. No representations were made by any of the defendants regarding Hagen's financial status, and Jim Seefeldt made no inquiries of his neighbor.

Plaintiffs' final contention that they were deceived because they did not know Skeffingtons would pay $200,000 instead of $95,000 is without merit. The record discloses the following scenario. Wyse was told in an informal conversation with Skeffingtons that they would pay $200,000 to liquidate their interest in Big I. Wyse mentioned to Lambert in informal conversation that Skeffingtons would pay to liq-

uidate their interest. Wyse did not mention a figure. Lambert and Jim Seefeldt negotiated the $95,000 figure. Wyse checked with Skeffingtons to be sure it was acceptable. Skeffingtons never met with Seefeldt, nor did they know Seefeldts were the prospective buyers until after the terms were set. After the terms were determined, Skeffingtons told Wyse they would pay him the difference between $95,000 and $200,000 as it was worth the full $200,000 to Skeffingtons to liquidate their interest. Lambert and Wyse split the $105,000.

The $200,000 figure was nowhere written down. It was discussed in informal conversation. It is generally considered that an owner's original listed or asking price is not necessarily the owner's firm price requirement. In the instant case, the record demonstrates an informality about the $200,000 term. The failure to disclose the figure was not a material misrepresentation.

■■ Seefeldts were not entitled to enter into the transaction with their eyes closed to the information available to them and then charge deception. (*Central States Joint Board v. Continental Assurance Co.* (1983), 117 Ill. App. 3d 600, 453 N.E.2d 932.) Information regarding the value of the assets was as available to Seefeldts as to Skeffingtons. Information pertaining to the future market of the property was accessible. The debt burden and interest costs were equally accessible. The record shows that Seefeldts never inquired about the particulars. We find from examining the entire record, the pleadings, affidavits, and depositions, that the order of the circuit court of Macon County entering summary judgments in favor of the Bank and Jerry and Robert Skeffington was correct.

Affirmed.

GREEN and McCULLOUGH, JJ., concur.