KEVIN KURTZ *et al.*, Plaintiffs-Appellants, v. ILLINOIS NATIONAL BANK OF SPRINGFIELD, Defendant-Appellee.

Fourth District   No. 4—88—0512

Opinion filed February 9, 1989.

Mercer Turner, of Bloomington, for appellants.

Robert J. Barry, of Lincoln, and George B. Gillespie, of Hinshaw, Culbertson, Moelmann, Hoban & Fuller, and Robert B. Oxtoby, of Van Meter, Oxtoby & Funk, both of Springfield, for appellee.

PRESIDING JUSTICE McCULLOUGH delivered the opinion of the court:

Plaintiffs appeal a trial court order granting summary judgment to defendant Illinois National Bank of Springfield (INB). Plaintiffs argue disputed issues of fact exist which preclude summary judgment on their interference with contractual expectancy action.

We affirm.

Plaintiffs and their father were farm tenants of the Scully Trust in Logan County. Under their lease, they could not encumber crops grown on the leased property through a security agreement. Plaintiffs' parents borrowed money from INB in March 1982 and entered a farm security agreement. A Uniform Commercial Code-1 (UCC) financing statement was filed. The Scully lease was not renewed for the 1985 crop year. Plaintiffs filed suit alleging INB's actions in filing the financing statement and taking a security interest in crops were either an intentional interference with their contract expectancy or a negligent interference.

Their complaint alleged: (1) plaintiffs' parents in March 1982 conveyed a security interest to and executed a financing statement in favor of INB; (2) plaintiffs and their father were lessees of a farm lease in 1984 with the Scully trust; (3) the lease included property described in the 1982 financing statement; (4) the financing statement and security agreement were made in violation of paragraph 2 of the lease; (5) plaintiffs' father told INB it could not have a lien on crops grown on the Scully lease property and relied on INB to prepare a financing statement and security agreement which would not violate the lease; (6) the lease was terminated on October 22, 1984, pursuant to a termination notice; (7) plaintiffs discovered the lease was terminated because of the security interest evidenced by the financing statement; (8) plaintiffs and their ancestors had been tenants of the Scullys for six decades and plaintiffs had not violated the terms of the lease; (9) except for the security interest evidenced by the financing statement, no violation of the lease had ever occurred; and (10) historically, the Scully leases were never terminated absent a default. Plaintiffs further alleged that but for the security interest as evidenced by the financing statement, they would have continued as tenants of the Scullys.

The financing statement filed on March 26, 1982, was attached to the complaint. It states:

"1. This financing statement covers the following types (or items) of property:

All farm machinery and equipment, supplies and attachments, now owned and hereafter acquired; all crops which are now *growing* and hereafter *are* grown on Real Estate Owned and, Rented in Sections given below and all products of all crops owned in Sections 21, 17, 16 of TWP 19N R3W and parts of Sec 10, 15 of Twp 19N R3W and land rented from Roller in Sec 17 and 20 of Twp 19N R3W all Logan Co. Illinois." (Emphasis added.)

On March 19, 1982, plaintiffs' parents entered a farm security agreement covering "[a]ll crops which are now growing or hereafter are grown on real estate owned of record by Kurtz; in [sections] 10, 15, 16, 17 and 21 and legally described as *** and the products of all such crops." On March 26, 1982, by memorandum agreement with the consent of the Scully trustees, INB was made a cotenant of the lease.

The Kurtz lease with the Scully trust covered property in section 17. It was a year-to-year lease which specifically stated the tenant could not encumber by security agreement crops grown on the leased premises.

On October 22, 1984, plaintiffs and their parents were sent a notice of termination letter from Ken Harp, a farm manager at First National Bank of Lincoln (FNB). FNB was the agent of the Scully trustees. The letter stated the tenants were to vacate the described premises at the expiration of the lease, February 28, 1985.

On April 29, 1988, INB filed a motion for summary judgment alleging there was no genuine issue of material fact as to plaintiffs' allegations against it. INB further alleged plaintiffs had not shown a duty or breach of a duty. INB argued the financing statement was not evidence of any negligence on its part, since it was controlled by the security agreement. In a response to the summary judgment motion, plaintiffs argued the trial court should consider a promissory note dated March 29, 1983, as evidence of a security agreement establishing a lien on crops grown on the leased property. The March 29, 1983, note states that as collateral plaintiffs' parents pledged a second mortgage on lands owned, the farm security agreement dated March 25, 1982, and the Scully lease.

Several depositions were attached to the motions. David Sullivan, loan officer for the special assets department of INB, stated that he understood INB did not have a lien on the crops grown on the Scully property. INB had never attempted to take such a lien. Sullivan supervised the preparation of the 1983 note but could not explain how the language "Scully Lease" was placed in the collateral section. Sullivan stated he believed it incorrectly listed the Scully lease. The March 1983 note also refers to the March 1982 security agreement.

Sullivan first discovered that the March 1983 note listed the Scully lease crop as collateral during his deposition which plaintiffs conducted in February of 1987. From March 29, 1983, through July 1985, he did not know the March 19, 1983, note listed as collateral crops grown on land leased from the Scully trust.

James Walden, a vice-president and trust officer for FNB, stated he was familiar with the Scully trust. FNB is administrator and agent for the Scully trustees. Walden supervises farm management for FNB. The Scully trust has always operated on a cash-lease basis rather than a crop-share basis. Walden remembered two leases which the Scully trustees terminated in the recent past. A lease in the past year had been terminated due to a lien against the crops. However, Walden was not familiar with any lease being terminated absent a breach by the tenant. In late 1984, an attorney asked Walden why the Kurtz lease had been terminated. Walden talked to Ken Harp. Harp was to tell the attorney the lease had not been renewed due to a problem with crop encumbrances. Walden stated FNB discovered the

UCC financing statement on the crops through the daily abstract report. The existence of the apparent lien was the reason for the termination of the lease.

Harp, formerly a farm manager for FNB, stated he was employed by FNB and not by the Scully trustees. He was familiar with the Kurtz family's lease and the Scully property. On March 5, 1982, plaintiffs were added to the lease as they were purchasing an interest in it. The Scully trustees knew of the transfer and approved it. As a matter of the policy, sons of leaseholders were given the first opportunity to purchase their fathers' interest. Harp stated that Peter Dennys Scully and Michael Scully directed him to send a notice of termination to plaintiffs' parents. This direction was the result of conversations at one or more trustees' meetings. As a reason for the termination notice, the trustees indicated through Walden that there was the apparent lien on the crops. Harp first saw the financing statement in the summer of 1984. It was recorded in Logan County on March 26, 1982. The trustees had a copy of the financing statement at the time they directed him to send the notice of termination. The Scully trustees knew about the financing statement in the summer of 1984. The Scully trustees indicated that they were concerned about the Kurtz family's financial condition.

Michael Scully, a trustee for the Scully trust, stated that historically tenants remained until they retired and handed their leases over to their sons. However, the new leaseholder had to be approved. Scully stipulated to the fact that plaintiffs were listed with their father as tenants on the last lease. In 1984, the Kurtz question was brought to Scully's attention by Harp, who had discovered a lien on the crops in contravention of the lease. However, the trustees decided to continue the lease if the Kurtz family could get adequate financing. A question about their financial ability to continue farming was considered. The trustees considered that the Kurtz family had incurred a large loan with INB. The trustees' decision was to continue the lease as long as the Kurtz family could receive adequate financing from INB or a different lender. Eventually, the lease was terminated by nonrenewal. The trustees sent a letter of termination to be in a more flexible position to not renew or continue the lease depending on the circumstances.

Scully further stated the lease was not terminated because of the lien but because of a number of factors, including the financial condition of the Kurtz family. The trustees wanted to give notice of nonrenewal within the statutory period. They would have renewed, however, if INB was satisfied with its financial arrangements with the

Kurtz family. Subsequently, he understood INB had decided not to refinance the loan.

Peter Dennys Scully, a trustee of the Scully trust, stated that at the September 19, 1984, trustees' meeting the Kurtz family's lease was discussed. The trustees tried to work out a way for the Kurtz family to keep farming, but wanted security. They decided to renew the lease if the Kurtz family could obtain adequate financing. However, they gave the statutory notice of nonrenewal. The Kurtz family had several large debts. The trustees felt the debt presented too high a burden for them to continue farming. In 1984, Harp brought the UCC-1 financing statement to Peter's attention. This also entered into the termination decision. The lease would not have been continued with Donald Kurtz as a tenant.

The minutes of several trustees' meetings were attached to INB's summary judgment motion. The September 19, 1984, minutes show the trustees decided to send a letter to INB confirming the trust would renew the lease with the Kurtz family if INB would finance the 1985 crop year. The lease would not be renewed if plaintiffs' parents could not obtain financing with some lender. The farm manager was asked to prepare and deliver a notice of lease termination with the explanation that the lease would be renewed if financing was obtained. Minutes for the November 14, 1984, trustees' meeting stated that because of the uncertain terms of financing and a large debt of plaintiffs' parents, the trustees resolved not to extend the lease for 1985.

The trial court found the March 26, 1982, security agreement created the security interest in question. If a discrepancy existed between the 1982 financing statement and the security agreement, the security agreement controlled. The court further found that the trust had an absolute right not to renew the lease. The court then found that any negligence of INB merely created a condition providing an opportunity for other causal agencies to act. It found no duty to plaintiffs on the negligence count and if there were a duty there was no breach of it which proximately caused the injury. Therefore, the trial court granted summary judgment to INB.

Initially, plaintiffs argue that a disputed issue of fact exists as to whether the lien was the proximate cause of the lease's nonrenewal. They contend the harm to them was foreseeable as a result of INB's action. Further, they contend INB knew about the lease. Plaintiffs argue this issue precludes entry of summary judgment. Plaintiffs then assert the trial court considered the correct financing statement but considered the wrong security agreement. Plaintiffs argue the court should have considered the March 1983 promissory note as a security

agreement. Since this note includes the "Scully Lease" in its statement of collateral, plaintiffs assert its existence raises an issue of fact precluding summary judgment.

INB asserts the trial court correctly found the security agreement controlled the financing statement. The security agreement described the collateral in a manner which excluded land leased from the Scully trust.

■■■ Summary judgment should be granted only where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. (*Seefeldt v. Millikin National Bank* (1987), 154 Ill. App. 3d 715, 506 N.E.2d 1052.) The court must consider the pleadings, exhibits, and affidavits and construe them strictly against the movant and liberally in favor of the opponent. (*Prather v. Decatur Memorial Hospital* (1981), 95 Ill. App. 3d 470, 420 N.E.2d 810.) Even though a complaint may purport to raise an issue of material fact, if such issue is not further supported by evidentiary facts, summary judgment is appropriate. *Fooden v. Board of Governors* (1971), 48 Ill. 2d 580, 587, 272 N.E.2d 497, 500-01, *cert. denied* (1972), 408 U.S. 943, 33 L. Ed. 2d 766, 92 S. Ct. 2847; *Seefeldt*, 154 Ill. App. 3d 715, 506 N.E.2d 1052.

■■ When a defendant files a motion for summary judgment, the plaintiff must come forward with some evidence of the elements of his cause of action. (*Sutton v. Washington Rubber Parts & Supply Co.* (1988), 176 Ill. App. 3d 85, 530 N.E.2d 646; *Lindenmier v. City of Rockford* (1987), 156 Ill. App. 3d 76, 85, 508 N.E.2d 1201, 1207.) Although plaintiff, as the party opposing summary judgment, is not required to prove his case, he must provide a factual basis under which he is entitled to judgment. *Burns v. Addison Golf Club, Inc.* (1987), 161 Ill. App. 3d 127, 514 N.E.2d 68; *Volling v. Amoco Chemical Corp.* (1987), 159 Ill. App. 3d 424, 512 N.E.2d 124; *Lindenmier*, 156 Ill. App. 3d 76, 508 N.E.2d 1201.

●■ Tort liability may be imposed upon a defendant who intentionally and improperly interferes with a plaintiff's rights under a contract with another person. Similarly, it may be tortious to interfere with a plaintiff's prospects of economic gain where those prospects are not reduced to a contract right. Interference with the contractual relationship may be improper. However, in the case where a prospective economic advantage is at issue, more latitude is allowed for interference. (W. Keeton, Prosser & Keeton on Torts §129, at 978 (5th ed. 1984); *Belden Corp. v. InterNorth, Inc.* (1980), 90 Ill. App. 3d 547, 552, 413 N.E.2d 98, 101.) Illinois recognizes actions for interference with contractual relationships and interference with prospective eco-

nomic advantage. (*Tom Olesker's Exciting World of Fashion, Inc. v. Dun & Bradstreet, Inc.* (1973), 16 Ill. App. 3d 709, 713, 306 N.E.2d 549, 553.) The torts are closely related. Each recognizes that a person's business relationships constitute a property interest which is entitled to protection from unjustified tampering. (*Belden*, 90 Ill. App. 3d at 551, 413 N.E.2d at 101.) The elements of interference with contractual relations are: (1) the existence of a contract between plaintiff and another; (2) the defendant's awareness of this relation; (3) the defendant's intentional and unjustified inducement of the breach of the contract; and (4) a subsequent breach caused by defendant's conduct; and (5) damages. *Belden*, 90 Ill. App. 3d 547, 413 N.E.2d 98.

■ The elements of tortious interference with prospective economic advantage are: (1) plaintiff must have a reasonable expectation of entering a valid business relationship; (2) defendant must purposefully interfere and defeat this legitimate expectancy; and (3) defendant's actions must cause harm to plaintiff. *Belden*, 90 Ill. App. 3d 547, 413 N.E.2d 98; *Cashman v. Shinn* (1982), 109 Ill. App. 3d 1112, 441 N.E.2d 940; *Tom Olesker's*, 16 Ill. App. 3d 709, 306 N.E.2d 549.

In the instant case, the lease expired at the end of its one-year term. It was not renewed. Renewal was not automatic. Since the lease between the Scully trustees and plaintiffs was not terminated early, plaintiffs are in effect suing for the loss of future leases or interference with prospective economic advantage. Plaintiffs contend the filing of the financing statement could have been intentional. Therefore, they argue the trier of fact should have resolved this issue. They contend inclusion of the term "Scully Lease" in the collateral portion of the 1983 promissory note was also intentional. Plaintiffs concede the financing statement in and of itself does not create a lien against the crops. However, they argue the appearance of a lien is sufficient to commit tortious interference with contractual relations.

Plaintiffs' argument does not address the 1982 security agreement to which the 1982 financing statement and the complaint refer. The March 1982 financing statement could, viewing the document most favorably to plaintiffs, have described a security interest taken in the crops grown on the Scully leased land. However, the parties agree the financing statement, as a notice document, did not of itself create a security interest. The security agreement appurtenant to the financing statement created the security interest. This security agreement, dated March 19, 1982, specifically applied to land owned of record by plaintiffs' parents and lands leased from the Roller family. It did not include any lands leased from the Scully family.

● ■ When a financing statement describes a greater quantity

of property than that described in the corresponding security agreement, the security interest is defined by the narrower description contained within the security agreement. (*Allis-Chalmers Corp. v. Staggs* (1983), 117 Ill. App. 3d 428, 453 N.E.2d 145.) Section 9—105(1)(*l*) of the Uniform Commercial Code-Secured Transactions defines security agreement as an agreement which creates or provides for a security interest. (Ill. Rev. Stat. 1987, ch. 26, par. 9—105(1)(*l*).) A security agreement is effective according to its terms. (Ill. Rev. Stat. 1987, ch. 26, par. 9—201.) The function of the financing statement is to notify third parties that a secured party may have a perfected security interest in the collateral described. *Allis-Chalmers*, 117 Ill. App. 3d 428, 453 N.E.2d 145.

In the instant case, the 1982 security agreement controlled the ambiguity in the UCC-1 financing statement. Since the security agreement did not conflict with the lease terms, no tortious interference could have occurred. Plaintiffs in their complaint alleged the security interest as evidenced by the financing statement constituted the violation of the lease. They further alleged this constituted an intentional interference with their renewal expectancy. Since the security agreement referred to in the complaint did not in fact impose a lien on the crops grown on the Scully lease, no intentional action could have been involved, and plaintiffs' cause of action for intentional interference with contractual relations must fail. The trial court correctly granted summary judgment.

Plaintiffs assert the trial court considered the wrong "security agreement." They assert the 1983 promissory note was a security agreement. This note included in the collateral statement the words "Scully Lease." This contention is without merit for several reasons. Plaintiffs' complaint alleged the 1982 security agreement was the action which violated their lease. They did not amend their complaint or allege anything about the 1983 promissory note. The summary judgment motion is tied to the allegations of the complaint. Secondly, the terms of the 1983 promissory note were not known to the Scully trustees, and thus, could not have been the basis of their decision not to renew the lease. There is no indication in the record that any of the parties knew of this language in the promissory note until approximately two years after the decision not to renew the lease. Third, Sullivan, in his deposition, stated the inclusion of the words "Scully Lease" on the 1983 promissory note was an error. Sullivan further stated that defendant did not intend to take any lien on the crops grown on the Scully leased land. Plaintiffs did not present any affidavits or indications to contradict this statement. Therefore, the state-

ment in the deposition should control.

The trial court correctly granted summary judgment to INB because plaintiffs' pleadings, even construed most favorably to them, do not show the 1982 document created a security interest in contravention of the lease. An ambiguity in the financing statement under the circumstances presented here cannot be said to represent an intentional interference with contractual expectancy.

INB also contends plaintiffs failed to present "sufficient" evidence of: an expectancy of lease renewal; INB's knowledge of the lease terms; and proximate cause. We disagree. Viewing the matters before the court most favorably to plaintiffs, disputed issues of fact existed as to these matters.

Plaintiffs urge this court to find negligence in preparation of the financing statement can constitute interference with contractual relations. However, only one court in Illinois has recognized negligence as a basis for interference with contractual relations. In *American Transportation Co. v. U. S. Sanitary Specialties Corp.* (1954), 2 Ill. App. 2d 144, 118 N.E.2d 793, the court found negligence could be the basis of a combined action for trespass and interference with contractual relations. In that case, however, a physical injury occurred to plaintiff as a result of defendant's actions. Additionally, plaintiff's contract with the third party was cancelled.

■■ All of the cases in Illinois other than *American Transportation* state that the tort is an intentional one. (See generally *Cashman*, 109 Ill. App. 3d 1112, 441 N.E.2d 940; *Kemper v. Worcester* (1982), 106 Ill. App. 3d 121, 435 N.E.2d 827; *Belden*, 90 Ill. App. 3d 547, 413 N.E.2d 98; *Tom Olesker's*, 16 Ill. App. 3d 709, 306 N.E.2d 549.) Prosser notes that in cases where a physical injury in addition to economic harm occurs, an exception to the rule that defendant's actions must be intentional exists. (See W. Keeton, Prosser & Keeton on Torts §129, at 982 (5th ed. 1984).) Here, plaintiffs alleged solely economic injury. Therefore, the exception would not apply. Additionally, under *Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69, 435 N.E.2d 443, recovery for purely economic injuries would not be allowed in a negligence action.

For the above reasons, we affirm the trial court.

Affirmed.

LUND and SPITZ, JJ., concur.