ALLSTAR MUSIC, INC., Plaintiff-Appellant, v. ALBERT L. ECKHOFF, d/b/a California Sports Bar and Grill, *et al.*, Defendants (Thomas Gorbett, d/b/a AVS Amusement Company, Defendant-Appellee).

Fourth District   No. 4—93—0647

Argued January 18, 1994.—Opinion filed February 18, 1994.

James D. Lynch (argued), of Springfield, for appellant.

Robert W. Mueller (argued), of Holley Law Office, of Springfield, for appellee.

PRESIDING JUSTICE McCULLOUGH delivered the opinion of the court:

Plaintiff, Allstar Music, Inc. (Allstar), filed a complaint against defendants Albert L. Eckhoff (Eckhoff), d/b/a California Sports Bar and Grill (California Sports Bar), ABMM Enterprises (ABMM), and Thomas Gorbett, d/b/a AVS Amusement Company (Gorbett or AVS), alleging breach of contract against Eckhoff and ABMM and tortious interference with contractual relations and civil conspiracy against Gorbett. The trial court granted Gorbett's motion for summary judgment and made a finding pursuant to Supreme Court Rule 304(a) (134 Ill. 2d R. 304(a)) that there was no just reason to delay

enforcement or appeal of that order. Allstar has filed an appeal, contending there are genuine issues of material fact as to (1) whether Gorbett tortiously interfered with a contractual relationship between Allstar, Eckhoff, and ABMM; and (2) whether Gorbett is liable to Allstar for civil conspiracy. We disagree with these contentions and affirm.

Eckhoff owned and operated the California Sports Bar in Springfield located in the Capitol City Shopping Center. On April 3, 1989, Allstar and Eckhoff (individually) and the California Sports Bar (also referred to as the "location") entered into a profit-sharing agreement, also known as a coin machine lease agreement. The terms of this agreement provided that Allstar would have the exclusive right to place at the location certain coin-operated machines for an initial term of five years, with an option to renew the agreement for an additional five years. Proceeds from the machines were to be divided equally between Allstar and the location. Paragraph 11 of this agreement provided:

"In the event of a sale of the LOCATION or business, LOCATION will notify OPERATOR [Allstar] in advance of settlement, and the name, address and identity of the purchaser, and agrees that the terms of the sale shall include provision for the assumption in writing of this Agreement by the purchaser, but LOCATION shall not be relieved of its obligations hereunder as a result of such assumption by the purchaser."

On April 16, 1990, Eckhoff sold the California Sports Bar to ABBA Enterprises, represented by Max Morgan (Morgan) and Al Bella (Bella). ABBA Enterprises, Inc., became ABMM shortly after this sale. This sales contract provided that ABMM agreed to assume the leases on the beverage-dispensing equipment and to sign a three-year lease with a one-year option with the Capitol City Shopping Center. There is no mention whatsoever in the contract as to the assumption of the profit-sharing agreement with Allstar.

On May 17, 1990, ABMM, represented by Morgan and Bella, entered into a revenue-sharing agreement with Gorbett, d/b/a AVS. This agreement provided that AVS would have the exclusive right to place coin-operated machines at the California Sports Bar for an initial term of two years. The proceeds were to be divided equally between ABMM and Gorbett.

In his discovery deposition, Gorbett testified that he moved his equipment into the California Sports Bar on May 17, 1990, immediately after they had entered into the revenue-sharing agreement. Gorbett stated there were coin-operated machines already at the premises which he assumed belonged to Allstar. He made this

assumption because prior to this date, he had received a letter, dated May 15, 1990, from Allstar's attorneys, referring to the five-year profit-sharing agreement between Allstar and Eckhoff. Gorbett indicated Bella had unplugged and moved Allstar's equipment to make room for the AVS machines.

Thereafter, also on May 17, 1990, Allstar filed its complaint. Counts I, II, and III were directed against Eckhoff and ABMM for breach of contract and sought specific performance of the profit-sharing agreement, injunctive relief, and damages. Count IV was directed against Gorbett, d/b/a AVS Amusement, Inc., alleging Gorbett had knowledge of the agreement between Allstar and Eckhoff regarding the exclusive right to place coin-operated machines at the California Sports Bar, and that despite this knowledge, entered into a contract with ABMM, whom he knew to be the successor owner of the California Sports Bar, for the placement of coin-operated machines at that location. This conduct was alleged to be a knowing and wilful inducement by Gorbett to have ABMM breach its agreement with Allstar and it was further alleged that these acts constituted the tortious interference with contractual relations. Count V sought punitive damages for this conduct, and count VI charged ABMM, Gorbett, and/or AVS with civil conspiracy.

Gorbett filed a motion for summary judgment on January 23, 1993. In that motion, Gorbett alleged there were no genuine issues of material fact since (1) there was no contract between ABMM and Allstar; (2) Gorbett was not aware of a contractual relationship between ABMM and Allstar; (3) Gorbett did not induce a breach of contract between ABMM and Allstar; (4) ABMM did not breach a contract with Allstar; and (5) Gorbett committed no unlawful act that resulted in the breach of any contract or profit-sharing agreement and therefore committed no civil conspiracy.

On June 22, 1993, arguments on Gorbett's motion for summary judgment were heard and judgment was entered in favor of Gorbett, d/b/a AVS Amusement. Allstar timely filed its notice of appeal.

The pleadings, depositions, and affidavits contained in the record on appeal reveal the following facts. Shelly Eckhoff, the wife of Eckhoff, was present in early April 1990 during a discussion between Eckhoff and Bella regarding the sale of the California Sports Bar. She identified the contract for sale and verified her husband's signature. Shelly testified her husband told Bella, prior to the execution of the contract for sale, there was a coin-operated machine agreement with Allstar that had to be honored. Shelly stated Eckhoff told Bella that he could obtain a copy of the contract from Ted Furkin at Allstar as he did not have a copy of it with him.

Gorbett gave a discovery deposition on July 16, 1990, at which he referred to a meeting on May 17, 1990, when he, Bella and Morgan entered into the revenue-sharing agreement. Gorbett testified they discussed Allstar's equipment because Bella explained he had moved those machines out of the way to make room for the AVS equipment. Gorbett assumed the machines already there at the California Sports Bar belonged to Allstar because of the letter he had received that morning from Allstar's attorney regarding the profit-sharing agreement between Allstar and Eckhoff.

According to Gorbett, Bella telephoned him regarding the possibility of locating machines at the California Sports Bar in May 1990. Gorbett had never met Bella or Morgan prior to the telephone call and the signing of the contract. Gorbett was out of town and subsequently returned Bella's telephone call. Bella wished to borrow $3,500 from Gorbett and Gorbett admitted ultimately giving Bella a $3,500 advance against commissions. Gorbett told Bella there would have to be a contract for the placing of AVS equipment at the California Sports Bar if he was to loan Bella this money. Gorbett stated John Caldwell was present at the California Sports Bar on the day AVS moved in its equipment. Caldwell allegedly told Gorbett Allstar had a contract with ABMM and there would be "trouble" if AVS placed its machines there. Gorbett explained to Caldwell that Allstar's contract was with Eckhoff and not with ABMM and that he therefore believed he could place his equipment there.

Eckhoff testified in his discovery deposition that he purchased the California Sports Bar in July 1988 and ran the business with his wife. Eckhoff leased the coin-operated machines from Allstar, whose president was Ted Furkin. He recalled entering into the profit-sharing agreement with Furkin, both individually and on behalf of the California Sports Bar. Eckhoff understood the terms of the contract including the division of profits and the requirement that he notify Allstar prior to the selling of the business. He also understood that the terms of the contract required him to include a provision in a contract for the sale of the business that the subsequent purchaser would assume, in writing, the profit-sharing agreement between himself and Allstar. Finally, Eckhoff knew that this assumption of the profit-sharing agreement by a subsequent purchaser would not relieve him of any obligations under his contract with Allstar.

Eckhoff testified he informed Allstar that he was selling the California Sports Bar to ABMM and that he had told Bella of the agreement with Allstar prior to entering into the contract for sale with ABMM. Eckhoff further stated that Ted Furkin of Allstar had reminded him, prior to the sale of the California Sports Bar to Bella,

that he needed to include a provision for the assumption of the profit-sharing agreement in the contract for sale.

Next, Eckhoff explained that in early April 1990, he had negotiated with Michael McGee, the owner of the Sheraton Hotel located near the California Sports Bar, for the sale of the California Sports Bar to him. He had drawn up a contract for sale with the help of Furkin and this contract contained the provision for the assumption of the profit-sharing agreement. Eckhoff also included in that contract a provision which released him of all liability under the profit-sharing agreement. However, the deal with McGee fell through and it was at this point that Bella expressed his desire to purchase the California Sports Bar. Eckhoff testified that serious negotiations between himself and Bella occurred during the week of April 16, 1990. These negotiations took place at the California Sports Bar and Eckhoff's wife was present. Eckhoff specifically testified he told Bella of the contract between himself and Allstar and that Bella knew that Allstar was currently providing the coin-operated machines at the California Sports Bar.

Eckhoff identified the contract for the sale of the California Sports Bar which he, Bella and Morgan entered into. However, Eckhoff testified the document presented to him at this deposition varied from the one he signed on April 17, 1990. He explained that page 2 of this contract was different than the one he earlier signed. He had given Bella the contract he had drafted with Furkin for McGee which contained the provision calling for the assumption of the profit-sharing agreement. Eckhoff stated this provision was located in the space that was now blank on page 2 of this contract for sale.

Eckhoff further explained that he was in need of money to pay back taxes and had arranged with Furkin for the sale of bar equipment, namely a beer cooler and some satellites, for a total of approximately $6,000. He claimed the contract he signed with Bella and Morgan on April 17, 1990, contained a list of personal property to be purchased with the California Sports Bar. The items to be sold to Furkin were not included on this list. Next, Eckhoff identified a bill of sale evidencing the sale of inventory to Furkin for $6,000. This sale was executed on April 3, 1989, and the items included on this bill of sale were excluded from the list of items sold to ABMM with the California Sports Bar. Neither Bella nor anybody else from ABMM was told that the sale of the business included this personal property sold to Furkin.

On the day Eckhoff and Bella entered into the contract for sale, they met at a restaurant near the California Sports Bar. Bella asked Eckhoff to bring the contract he had previously drafted for McGee

and said they would use that contract. Bella explained to Eckhoff that he had spoken with Al Wilke from the Illinois Department of Revenue, who needed to see a signed copy of the contract. Eckhoff testified he signed the contract and witnessed Bella sign it and then Bella indicated he would fax it to Wilke. Bella told Eckhoff he would provide him with a copy later. However, Eckhoff never received a copy of this contract. Eckhoff next saw this contract at the deposition.

On examination by ABMM's attorney, Eckhoff stated he had not yet been paid by Furkin for the $6,000 worth of equipment. Eckhoff examined an exhibit identified as the contract between himself and McGee and a fax cover sheet to Wilke. Eckhoff said that the exhibit was not the final copy of the contract between himself and McGee because the list of equipment was different. He also stated the paragraph regarding payment to the IRS and the paragraph regarding the lease with the Capitol City Shopping Center were different. Eckhoff explained that he and McGee had negotiated four different versions of the contract and this was the first, not the final, draft. He denied the final draft was sent to the Illinois Department of Revenue for approval.

The affidavit of William Michael Fuiten appears in the record. In that affidavit, he states he was the attorney for McGee with regard to the possible purchase of the California Sports Bar. Fuiten further states he drafted the proposed contract for sale and the final draft of that contract was faxed by Wilke to the Illinois Department of Revenue on April 16, 1990. A copy of the final contract and the fax cover sheet and letter are attached to the affidavit. This contract does not contain a provision calling for the assumption of the profit-sharing agreement between Allstar and Eckhoff. There is a paragraph in this contract which assumes the lease of the beverage-dispensing equipment. A bill of sale for certain personal property is also included, specifically listing, among other things, a beer cooler and two satellites.

Alvin Wilke, of the Bulk Sale Section of the Illinois Department of Revenue, stated in his affidavit that he received the final draft of the contract for sale for the California Sports Bar between Eckhoff and McGee on April 16, 1990. He further stated that such agreement did not contain a paragraph for the assumption by McGee of the profit-sharing agreement between Allstar and Eckhoff. Copies of the fax cover sheet, cover letter and contract were attached to his affidavit. The agreements between Eckhoff and McGee and Eckhoff and ABMM appear to be similar but page 2 of the agreement between Eckhoff and ABMM appears to be in a different typestyle than the

remainder of the agreement and there is a large blank space at the bottom of page 2 of that agreement.

Finally, Max Morgan gave his discovery deposition on December 2, 1992. He testified he was the sole owner of the California Sports Bar. Morgan became acquainted with Eckhoff through the Capitol Teletrack, an off-track betting establishment in Springfield, where he was a teller. Morgan testified he signed the agreement to purchase the California Sports Bar in the presence of Eckhoff and Bella. However, he then stated he could not deny that Eckhoff was not present when he executed the contract. He indicated the contract appeared to be between Eckhoff and ABBA Enterprises, Inc., of which he was the sole officer. After the contract was executed, ABBA Enterprises was renamed ABMM Enterprises, Inc. Morgan testified that Bella is an officer (vice-president) of ABMM and he had not seen him since July 1990. Morgan contributed $6,000 to form ABMM to help facilitate the purchase of the California Sports Bar.

Next, he explained that sometime after the purchase of the California Sports Bar, he decided to switch coin-operated machine vendors. Morgan testified he wanted a vendor whom he knew better and could trust. He denied being told by Eckhoff that he was under a contract with Allstar to provide coin-operated amusement devices to the California Sports Bar. Morgan did not know whether Eckhoff had told Bella about the contract with Allstar. Morgan estimated he had been using Allstar's product for approximately four to six weeks prior to deciding to change operators. He acknowledged that ABMM gave Allstar notice that it would be terminating all business relationships with it.

In May 1990, ABMM entered into a contract with AVS for the placement of coin-operated machines. ABMM chose AVS after talking to several other similar vendors. Morgan admitted receiving a check for $3,500, payable to himself and Bella, from Gorbett at the time they entered into the contract. Finally, Morgan stated that at no time did he have a written contract with Allstar for the coin-operated machines at the California Sports Bar. Morgan also testified neither Gorbett nor AVS caused him or ABMM not to honor any contract between Allstar and Eckhoff.

A motion for summary judgment is appropriately granted when the pleadings, depositions, and affidavits on file show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. (Ill. Rev. Stat. 1991, ch. 110, par. 2—1005(c).) Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt. (*Outboard Marine Corp. v. Liberty Mutual Insurance*

*Co.* (1992), 154 Ill. 2d 90, 102, 607 N.E.2d 1204, 1209.) In deciding whether summary judgment is proper in a particular case, the circuit judge must construe the motion and other relevant documents strictly against the movant and liberally in favor of the opponent. *Purtill v. Hess* (1986), 111 Ill. 2d 229, 240, 489 N.E.2d 867, 871.

In deciding a motion for summary judgment, a court may draw inferences from undisputed facts. However, where reasonable persons could draw divergent inferences from undisputed facts, issues should be decided by the trier of fact and the motion should be denied. (*Loyola Academy v. S&S Roof Maintenance, Inc.* (1992), 146 Ill. 2d 263, 272, 586 N.E.2d 1211, 1215.) An order granting summary judgment will be reversed by a reviewing court if it concludes that a material question of fact exists. *Department of Revenue v. Heartland Investments, Inc.* (1985), 106 Ill. 2d 19, 31, 476 N.E.2d 413, 419.

■ There are five elements necessary to state a cause of action for tortious interference with contractual relations: (1) the existence of a valid contract; (2) defendant's knowledge of the contract; (3) intentional and malicious inducement of the breach; (4) a subsequent breach by a third person due to defendant's wrongful conduct; and (5) damages resulting from the breach. (*Lawless v. Central Production Credit Association* (1992), 228 Ill. App. 3d 500, 509, 592 N.E.2d 1210, 1216.) This tort recognizes that a person's business relationship constitutes a property interest which is entitled to protection from unjustified tampering. (*Kurtz v. Illinois National Bank* (1989), 179 Ill. App. 3d 719, 727, 534 N.E.2d 1007, 1012.) Civil conspiracy involves either the accomplishment of a lawful result by unlawful means or an unlawful result by lawful means. *Bartley v. University Asphalt Co.* (1984), 129 Ill. App. 3d 231, 234, 472 N.E.2d 499, 501.

On appeal, Allstar contends there were differing factual viewpoints as to (1) whether there was a contract between Allstar and ABMM; (2) whether Gorbett knew of such a contract; and (3) whether his payment of $3,500 to ABMM induced it to breach its assumed contract with Allstar. Finally, Allstar notes the "long-standing issues concerned with the discovery compliance" suggest serious difficulties with proof of contested issues and show that the trial court erred in granting summary judgment in favor of Gorbett.

■ Initially, we note there is no written contract between Allstar and ABMM for the placement of coin-operated machines at the California Sports Bar. Thus, any contract between these two entities, which must exist for Allstar to sustain a cause of action, has to be an implied contract resulting from the facts and circumstances surrounding these parties and their various actions. Allstar contends Gorbett knew of the April 3, 1989, contract between it and Eckhoff,

including the assumption provision, as well as the April 16, 1990, contract between Eckhoff and ABMM. However, Gorbett did not have any contact with ABMM until May 1990 when Bella telephoned him regarding the possibility of placing the machines at the California Sports Bar. Gorbett had no knowledge of Allstar's involvement with the California Sports Bar until one month later when he received the letter from Allstar's attorneys on May 17, 1990. Even then, however, Gorbett only saw a written contract between Allstar and Eckhoff and he was negotiating solely with ABMM.

In conclusion, any action by Allstar against ABMM or Eckhoff, which is not an issue in this appeal, would necessarily refer to the contract between Allstar and Eckhoff. However, as to Gorbett, any assertion that there was a contract between Allstar and ABMM, or that Gorbett had knowledge of any such contract and that he intentionally and maliciously induced ABMM to breach that contract, is too remote and too tenuous to support a cause of action for tortious interference with contractual relations.

Accordingly, the judgment of the circuit court of Sangamon County granting summary judgment in favor of Gorbett is affirmed.

Affirmed.

KNECHT and LUND, JJ., concur.