**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 190080-U

Order filed July 24, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| BRIAN D. NELSON and REBECCA K. NELSON, | ) ) ) | Appeal from the Circuit Court of the 14th Judicial Circuit, Henry County, Illinois. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0080 Circuit No. 15-L-23 |
| DOUGLAS R. NELSON, NEAL R. NELSON, LORI B. NELSON, LANDMARK DIVIDEND, LLC, LANDMARK INFRASTRUCTURE HOLDING CO., BRUCE L. CARMEN, and CARMEN LAW OFFICE, P.C., | ) ) ) ) ) ) | |
| Defendants-Appellees. | ) ) | Honorable Terence M. Patton, Judge, Presiding. |

_____

JUSTICE SCHMIDT delivered the judgment of the court.
Justices Carter and Holdridge concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court did not err in its disposition of plaintiffs' claims.

¶ 2    This dispute arises out of the attempt to transfer business and personal assets valued in the millions of dollars between family members. The transfers were meant to effectuate the substitution of one party for another in the Nelson Family Farms, LLC (LLC). The contract

controlling these transactions consisted of handwriting on two sides of a single sheet of paper. Plaintiffs, Brian and Rebecca Nelson, drafted the contract. Without consulting an attorney or exercising due diligence, the parties began exchanging money and equipment. One of the parties contacted an attorney to complete the title work necessary to transfer parcels of real estate contemplated in the contract and to effectuate the substitution of members in the LLC. Plaintiffs advanced numerous arguments based on the contract language, transfer of real property, fiduciary duties, and an alleged oral contract delegating responsibility for the transfer of the real property. Specifically, at issue in this matter is a lessor's interest in a cell tower lease sold to a third party. The circuit court either dismissed plaintiffs' claims or granted summary judgment in favor of defendants. For the reasons that follow, we affirm.

¶ 3                                                   I. BACKGROUND

¶ 4         Brothers Brian and Doug Nelson jointly operated a hog confinement business. In 2007, the brothers created the LLC, an Illinois limited liability company, with each being equal owners and serving as member-managers. The LLC owned the land on which the confinement business was located. Abutting this land was a grain handling facility that was imbedded within a 160-acre parcel referred to as the Home Farm. Brian, Doug, and their mother created a land trust in 1990 known as the Nelson Family Land Trust. Brian and Doug are the sole beneficiaries (and owners) of the trust. The land trust held legal title to some of the property involved in the farm operations including the Home Farm. Brian, Doug, and Doug's son, Neal Nelson, each farmed grain on land they owned or rented individually but made payments to each other to equalize the amount of land each farmed.

¶ 5         Neal and his wife, Lori Nelson, jointly owned a 64-acre property referred to as Viola Farm and a lessor's interest in a lease for a cell tower located on the property. The lessor's interest in the

cell tower lease was conveyed to Neal and Lori separately from the fee interest in Viola Farm by the previous owner. When they purchased Viola Farm, the warranty deed they received, and that was recorded, explicitly excluded the cell tower lease from Viola Farm. The assignment of the cell tower lease to Neal and Lori was also recorded.

¶ 6        In 2014, discussions took place between Brian, Doug, and Neal concerning Brian's desire to retire from farming and Neal's desire to acquire Brian's interest in the LLC along with other farming assets. These discussions culminated in a contract referred to by the parties as Exhibit B (contract). The contract was drafted by Brian and his wife, Rebecca Nelson. At the top of the document it states, "all land and building valuations are at 90%." The contract goes on to describe the transfer of farm machinery and real estate among the parties and sets forth additional cash payments necessary to remove Brian from the LLC, with the categories broken into sections. Six parcels of real estate were to be transferred. Four of the parcels were held in the land trust and were to be transferred to Brian and Doug individually. Pertinent to this appeal, section 2 conveyed to Neal, Brian's one-half interest in the hog building and one-half interest in the grain site in return for Neal's conveyance of Viola Farm to Brian. Underneath the language "Viola Farm to Brian" appeared the number $600,000. The contract contains no reference to the cell tower lease or who was responsible for effecting the transfers of property. An attorney did not assist Brian or Rebecca in drafting the contract.

¶ 7        On December 13, 2014, Brian, Doug, and Neal met and reviewed the contract. In the absence of their wives, all three signed relevant sections of the contract that applied to them. Brian and Neal signed section two; Doug did not. Thereafter, the parties proceeded to exchange equipment and money as described in the contract without the assistance of counsel.

¶ 8                     A. Directions to and Actions of Counsel

¶ 9        Doug, acting in his capacity as member manager of the LLC, retained Bruce Carmen and the Carmen Law Office, P.C., to prepare documents required to effectuate Brian's removal from the LLC. Doug also provided Carmen a handwritten document with descriptions of real estate parcels and instructions on whom to transfer the parcels. The instructions were captioned "Split Nelson Family Trust." Per the instructions, Carmen was to transfer four parcels out of the Nelson Family Land Trust to Doug and Brian individually. Relevant here, the instructions directed Carmen to transfer the Home Farm, which included the imbedded grain facility, to Doug and his wife, Terri Nelson even though a one-half interest of the grain facility was to go to Neal under the contract. When Doug approached Carmen for representation, the parties had already transferred equipment and money in accordance with the contract. None of the parties provided Carmen with a copy of the contract. Carmen did not inquire into the formalities of transferring property out of the land trust.

¶ 10       Carmen prepared a document entitled "Action of Managing Member" stating that Brian had sold his interest in the LLC to Neal. Carmen also prepared articles of amendment for recordation with the Illinois Secretary of State (SOS) evidencing the membership change to the LLC's articles of organization. Doug executed both of these documents in his capacity as a member of the LLC and Carmen forwarded the documents to the SOS. Carmen never contacted Brian or vice versa and Brian did not sign any of the documents. Carmen also failed to inquire what the LLC operating agreement required to substitute members of the LLC.

¶ 11       Lori Johnson, Carmen's paralegal, ordered title searches for the six parcels of real estate to be transferred. The title records for Viola Farm revealed that the warranty deed conveying the real estate to Neal and Lori expressly excluded a cell tower lease and an easement for the cell tower;

an outstanding mortgage encumbering the property was also apparent. Carmen sent invoices to the LLC for the work done at the direction of Doug.

¶ 12                    B. Cell Tower Lease

¶ 13    In order to transfer Viola Farm to Brian, Neal was required to pay off the mortgage encumbering the property before closing. Prior to December 13, 2014, Neal had been in contact with Landmark Dividend, LLC, and Landmark Infrastructure Holding Company, LLC, (Landmark) about selling the lessor's interest in the cell tower lease. After Brian, Doug, and Neal had signed the contract these discussions with Landmark continued. Neal informed Landmark that he was in the process of selling Viola Farm. On or about January 14, 2015, Neal and Lori granted Landmark an option to purchase their lessor's interest in the cell tower lease and obtain an easement for the purchase price of $106,000. Neal requested that the option agreement be backdated to December 12, 2014. He also requested that Landmark make payment directly to his lender Bank Orion who held the mortgage on Viola Farm. Landmark acquiesced and the parties signed the option agreement.

¶ 14    Neither Brian nor Rebecca had any knowledge of the option agreement prior to the April 4, 2015, closing for Viola Farm. On March 2, 2015, Johnson, received an inner office message from Carmen, instructing "Call Neal Nelson and make an appointment regarding the sale of some cell tower land." The next day at Carmen's direction, Johnson called Neal and verified that the cell tower lease was not part of Brian, Doug, and Neal's agreement; Neal stated it was not. On March 6, 2015, Neal and Lori finalized their transaction with Landmark executing an easement and assignment of lease agreement. Neal used the proceeds to extinguish the encumbrance on Viola Farm. On March 31, 2015, Johnson received a copy of the recorded mortgage release on Viola Farm from Bank Orion. A title commitment was secured on April 2, 2015, and on April 30,

Johnson mailed a copy of the warranty deed, recorded April 8, to Brian and Rebecca. Carmen billed the LLC for the work done transferring the cell tower lease for Neal.

¶ 15                                    C. The Dispute

¶ 16        After receiving the deed and taking possession of Viola Farm, Brian approached Neal and asked for information regarding the cell tower lease; Neal informed Brian he had sold the lessor's interest in the cell tower lease. Brian and Rebecca expected that the interest in the cell tower lease would be conveyed to them along with the fee interest in Viola Farm. The belief that they were to receive the lessor's interest in the cell tower lease is the crux of this dispute.

¶ 17        After mediation proved unsuccessful, Brian and Rebeca filed the current suit in October 2015. The operative pleading in this instance is the 54-page, 8-count second amended complaint and its various amended counts. Concerning Neal and Lori, counts I and II claimed a breach of contract by fraudulent misrepresentation and concealment of material facts, count III asserted tortious interference with contract, count IV averred common law fraud, count V claimed civil conspiracy, and count VIII claimed consumer fraud. Regarding Doug, he was included as a defendant in counts II and IV. The complaint named Landmark as a defendant under the civil conspiracy claim in count V and the conversion claim under count VI. Bruce Carmen and Carmen Law Office, P.C., were named as a defendant in count VII, which pled legal malpractice. Doug, Neal, and Lori brought motions to dismiss which achieved dismissal of Doug from the action and count III (tortious interference of contract) and count VIII (Consumer Fraud Act claims).

¶ 18        Subsequently, Neal asserted a counterclaim against Brian alleging breach of contract for failing to convey the one-half interest in the grain site. After receiving the counterclaim, Brian filed a third-party complaint against Doug, which is also relevant to this appeal. The third-party complaint contained three counts, count I alleged breach of contract by way of fraudulent

misrepresentation and concealment of material facts. Brian alleged that Doug breached an oral contract to effectuate the transfers of real estate on his behalf when he failed to direct Carmen to transfer the one-half grain site to Neal. Count II asserted common law fraud based on the same facts and, count III claimed Doug breached a fiduciary duty owed to Brian by way of the LLC and a grain farming partnership when he transferred the grain site to himself.

¶ 19                                              D. Depositions

¶ 20        Brian was deposed twice in this matter. He stated that he and his brother Doug had been partners in running the hog confinement business for close to 30 years. There was also a grain operation that functioned as a three-way partnership between himself, Neal, and Doug. They covered their own expenses and made payments to each other to equalize the amount of land farmed. To his knowledge, Neal never advertised Viola Farm as being for sale to the general public. Although he knew the cell tower lease was a separate item, he believed it was included in the sale of Viola Farm because the tower was on the property. Brian was aware the cell tower lease could be severed from the land from his own dealings with a company trying to buy the lessor's interest in a wind turbine on one of his own properties.

¶ 21        Brian confirmed that he dictated the terms of the contract to Rebecca. Brian also acknowledged that he failed to do any of the following: (1) talk to Neal or Lori about receiving the cell tower lease, (2) find out the terms of the cell tower lease or ask for a copy of the lease, (3) discuss receiving the cell tower lease with Carmen or his office, (4) examine the warranty deed for Viola Farm which expressly excluded the cell tower lease, or (5) ask Carmen to represent him. Brian further noted that Neal and Lori never said whether the cell tower was included in the sale of Viola Farm. Lori and Brian failed to discuss any transaction concerning Viola Farm and Brian thought he was being "generous" as to the valuation of Viola Farm. Brian assigned the value of

$600,000 to Viola Farm to entice Neal to engage in the contract. This value was at 100% as opposed to 90% as specified at the top of the contract. Brian also acknowledged he was aware that Lori's signature was required on the contract because she also owned Viola Farm but that Neal and Doug threatened to walk away from the deal if the contract was not signed then and there. Neither Neal nor Lori told Brian the farm was worth $600,000 but Brian insists Neal promised the farm was worth that amount by signing the contract. In hindsight, the contract should have included terms relating to the cell tower lease, but he trusted Neal because he was family and assumed he would receive the cell tower lease.

¶ 22        When discussing the grain site, Brian did not know if he could actually transfer the one-half grain site to Neal but hoped an attorney could effectuate the transfer. He knew to properly transfer the imbedded property required an accurate legal description. He acknowledged having a survey done would be a prudent undertaking. When presented with a plat book depicting the Home Farm and grain site, Brian stated that the plat was not accurate. When presented with a legal description of the grain site Neal prepared previously, Brian stated that the description was not accurate but then stated he was unsure of how accurate it was. He was unsure of how many acres the abutting hog site and Home Farm consisted of.

¶ 23        Brian also claimed that Doug was responsible to transfer the properties as outlined in the contract. He alleged an oral agreement where Doug would effectuate the transfer of real property to Neal. However, he did not think it was Doug's responsibility to make sure he received Viola Farm. Brian also had qualms with how he was removed from the LLC but confirmed he wanted to be removed as a member as soon as possible because of the liability issues that came from running a hog confinement facility and regulation from the Environmental Protection Agency.

¶ 24    Neal was also deposed twice. Neal stated that there was a grain partnership and that Brian, Doug, and himself were equal partners in the endeavor. They each paid their own expenses but there was no conversation concerning the split of profits. Neal viewed Viola Farm and the cell tower lease as two separate entities. Neither Brian nor Rebecca asked whether the lease was included in the sale or asked about the lease in general. Neal had previously tried to takeover Brian's spot in the LLC through a cash payout, but he was unable to finance the transaction. After he signed the contract, he knew he had to unencumber Viola Farm to properly transfer it to Brian. He had been in discussion with Landmark regarding the sale of the cell tower lease prior to December 13, 2014. On January 24, 2015, Neal and Lori granted Landmark an option to purchase their interest in the cell tower lease and an easement for $106,000. Neal and Landmark closed on the cell tower lease on March 6, 2018. Neal did not tell Landmark to whom he was selling Viola Farm but had advised them of the sale. When asked whether he had conversations with Doug regarding the one-half grain site he was supposed to receive from Brian that Doug retained for himself, Neal stated he had not. Later on, he clarified that he had discussed the one-half grain site with Doug. When asked why nothing was done to remedy the situation, he responded by saying, "I don't know."

¶ 25    When deposed, Doug stated that Brian was responsible for his own property transfers under the agreement. He also claimed Brian told him he could have the grain site and to do whatever he wanted with it. Doug was not completely sure who owned the grain site at the time of the deposition as a proper survey was never conducted to sever the land from the parcel it was embedded within. He was also unsure how many acres the grain site encompassed. In Doug's opinion, Brian was responsible for the survey needed to convey the grain site. When asked why he had not transferred the grain site to Neal as contemplated in the contract, he stated that he was

not going to transfer property that was the subject of a legal dispute. Doug also stated that he was not responsible to have the survey conducted to properly transfer the grain site.

¶ 26        Neal did not tell Doug about the communications with Landmark concerning the cell tower lease. Doug did not give the contract to Carmen when requesting the transfer of the properties. Doug stated he, Brian, and Neal were partners in a grain operation. They all paid their own expenses. It was not established how any profits from the farming of grain were shared.

¶ 27                                    E. Disposition of Claims Below

¶ 28        In July 2017, the circuit court granted Neal and Lori's motion to dismiss with prejudice the claim under the Illinois Consumer Fraud and Deceptive Practices Act (Act) (815 ILCS 505/1 *et seq.* (West 2018)), finding the act did not apply to a private sale of real estate. The court believed that the Act did not apply to the facts of this case; specifically, a private real estate transaction between family members. Approximately two years later, Neal and Lori moved for summary judgment on all counts pled against them by Brian and Rebecca but did not ask for judgment on their counterclaim. They argued there was no enforceable contract as to the cell tower lease because Lori never signed the agreement. Additionally, the parties never discussed the inclusion of the cell tower lease. Concerning the fraud claim, Neal and Lori argued they made no false misrepresentations and had no duty to disclose absent facts giving rise to a fiduciary relationship.

¶ 29        Carmen filed two motions, one for summary judgment and another for partial summary judgment. Of importance, he argued that he was not the proximate cause of Brian and Rebecca's damages.

¶ 30        Regarding Doug, the court previously dismissed count I (breach of contract) of the third-party complaint for want of consideration. In the same order, the court denied Doug's request for partial summary judgment on counts II and III.

¶ 31    The court took the matter under advisement and in December 2018 issued its opinion. On the contract claims regarding Neal and Lori, the court found that there was no enforceable contract to convey the cell tower lease because Lori was a joint tenant and never signed the contract or orally agreed to convey the lease. The court also found that Brian and Rebecca failed to convey the one-half grain site interest to Neal barring any claim of full performance. And even if fully performed, there was no agreement, oral or otherwise, with Lori that could be saved by the exception to the statute of frauds. On the fraud claim, the court found that Neal and Lori made no representations to Brian and Rebecca concerning the cell tower lease. The court found the fraudulent concealment claim must fail because caveat emptor is the traditional rule in real estate transactions and there were no facts pled giving rise to a duty to disclose. Given the failure of Brian and Rebecca's underlying tort claim, the court ruled in favor of Landmark on the conspiracy claim.

¶ 32    The court also entered judgment in favor of Carmen, finding that he was not the proximate cause of Brian and Rebecca's damages. Specifically, the court noted that Carmen would have had only four days to discover that the contract, which he did not have and did not mention a cell tower lease, was intended by Brian and Rebecca to convey the cell tower lease along with Viola Farm before Neal executed the option agreement with Landmark.

¶ 33    The court then exercised its discretion to reconsider its previous ruling on Doug's motion for partial summary judgment with respect to the remaining counts in the third-party complaint. The court vacated its previous decision denying Doug the relief requested and entered judgment on counts II and III of the third-party complaint in his favor.

¶ 34    Following the ruling, Neal voluntarily dismissed his counterclaim against Brian and Rebecca without prejudice.

¶ 35    Brian and Rebecca appeal.

¶ 37        Brian and Rebecca present numerous contentions of error below. They argue (1) genuine issues of material fact preclude summary judgment on all counts, (2) the court erred in applying the law in their legal malpractice, contract, and consumer fraud claims, (3) Neal and Doug owed Brian a fiduciary duty, and (4) the court erred by ruling in favor of Doug on the third-party complaint. Defendants, by and large, maintain and repeat the arguments adopted below. For clarity, we will discuss Brian and Rebecca's arguments as they relate to each defendant: (1) Carmen, (2) Neal, Lori, and Landmark, and (3) Doug.

¶ 38        The purpose of summary judgment is not to try a question of fact but to determine if one exists. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 42-43 (2004). Summary judgment is proper where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2018). The party moving for summary judgment bears the initial burden of proof. *Performance Food Group Co., LLC v. ARBA Care Center of Bloomington, LLC*, 2017 IL App (3d) 160348, ¶ 18. A defendant moving for summary judgment may meet his or her burden of production in two ways: (1) by affirmatively showing that some element of the case must be resolved in his or her favor or (2) by establishing that there is an absence of evidence to support the nonmovants case. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624 (2007). "Once the moving party satisfies its initial burden of production in the summary judgment proceeding, the burden of production shifts to the nonmoving party *** to present evidence to establish that there are genuine issues of material fact and/or that the moving party is not entitled to judgment as a matter of law." *Performance Food Group*, 2017 IL App (3d) 160348, ¶ 18. If the plaintiff fails to establish any element of his or her claim, summary judgment

for the defendant is proper. *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). "Factual issues which are not material to the essential elements of the cause of action or defense, regardless of how sharply controverted, do not warrant the denial of summary judgment." *Swope v. Northern Illinois Gas Co.*, 251 Ill. App. 3d 850, 858 (1993).

¶ 39 Summary judgment is encouraged as an expeditious manner of disposing of a lawsuit. *Adams*, 211 Ill. 2d at 43. "In appeals from summary judgment rulings, review is *de novo*." *Id.* When *de novo* review applies, the appellate court performs the same analysis that the trial court would perform. *Dawson v. City of Geneseo*, 2018 IL App (3d) 170625, ¶ 11. We may affirm a trial court's grant of summary judgment on any basis supported by the record. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 97 (1995).

¶ 40                                     A. Legal Malpractice Claim

¶ 41 We turn first to Brian and Rebecca's allegation of legal malpractice by attorney Carmen. They argue that (1) genuine issue of material fact precluded entry of summary judgment in favor of Carmen and (2) the circuit court erred in its application of the law. The circuit court found that Brian and Rebecca could not establish proximate cause while also finding that whether they were clients of Carmen was a contested factual issue.

¶ 42 "To prevail on a claim of legal malpractice, a plaintiff client must plead and prove the following four elements: (1) that the defendant attorney owed the plaintiff client a duty of due care arising from the attorney-client relationship, (2) that the defendant breached that duty by committing a negligent act or omission, (3) that the defendant's breach of duty proximately caused the plaintiff's injury, and (4) that the plaintiff suffered actual damages." *Laurent v. Johnson*, 2017 IL App (3d) 160627, ¶ 18. As explained above, the failure by plaintiff to establish an element of the cause of action will entitle defendant to summary judgment. *Williams*, 228 Ill. 2d at 417.

¶ 43　　　　Causation requires that a plaintiff prove both cause in fact and legal cause. *Gaylor v. Campion, Curran, Rausch, Gummerson & Dunlop, P.C.*, 2012 IL App (2d) 110718, ¶ 62. To determine "cause in fact" courts employ either the traditional "but for" test or the "substantial factor" test. *Id.* However, in a transactional setting " 'an attorney's liability for failing to advise a client of the foreseeable risks attendant to a given course of legal action is not predicated upon the impropriety of the recommended course of action; rather, it is predicated upon the client's exposure to a risk that the client did not knowingly and voluntarily assume.' " *Union Planters Bank, N.A. v. Thompson Coburn LLP*, 402 Ill. App. 3d 317, 344 (2010) (quoting *Metrick v. Chatz*, 266 Ill. App. 3d 649, 654-55 (1994)). " 'Consequently, to establish the element of proximate cause, it is necessary for the client to both plead and prove that had the undisclosed risk been known, he or she would not have accepted the risk and consented to the recommended course of action.' " *Id.* (quoting *Metrick*, 266 Ill. App. 3d at 655). " 'If an attorney's advice falls below the standard of reasonable legal services, any damages which proximately flow from the client's acceptance of that advice are recoverable in a negligence action against the attorney.' " *Id.*

¶ 44　　　　Further, the Rules of Professional Conduct do not provide a separate duty or cause of action; however, they are relevant in a legal malpractice action. See *Owens v. McDermott, Will & Emery*, 316 Ill. App. 3d 340, 353 (2000) ("The mere fact that an attorney may have violated professional ethics does not, in and of itself, give rise to a cause of action for damages.").

¶ 45　　　　In arguing genuine issues of material fact precluded summary judgment, Brian and Rebecca contend that (1) they were clients of Carmen or intended beneficiaries of his services, (2) Carmen was conflicted by taking Neal on as a client, and (3) Carmen failed to observe the formalities of the LLC and land trust. While there may be genuine issues of fact as to some elements of the claim, Carmen has established that at least one of the elements of the malpractice

claim must be resolved in his favor. Merely pointing us to different elements asserting that questions of fact remain is inadequate to overcome this fatal defect. See *Hayward v. C.H. Robinson Co.*, 2014 IL App (3d) 130530, ¶ 32 (stating defendant is entitled to judgment if plaintiff fails to establish all elements of claim); see also *Jackiewicz v. Village of Bolingbrook*, 2020 IL App (3d) 180346, ¶ 48 (Holdridge, J., dissenting) (noting where a defendant moving for summary judgment establishes plaintiff lacks sufficient evidence to prove an essential element of the claim, the burden shifts to plaintiff to provide a factual basis supporting the elements of the claim).

¶ 46         The circuit court focused on "but for" causation in disposing of this claim below. The court reasoned that there was no written contract for the cell tower lease. Even assuming a valid contract for the cell tower lease, the undisputed facts showed that Carmen was not the but for causation of Brian and Rebecca's alleged damages. The court found a genuine issue of material fact existed as to who Carmen represented the LLC alone, or the LLC and individuals involved. After conducting our own review, we agree with the circuit court that Carmen was not the proximate cause of Brian and Rebecca's damages.

¶ 47         Carmen did not give Brian and Rebecca any legal advice that they relied on in making their decisions in this transaction. The record shows that Brian knew the cell tower lease was a separate item but *assumed* it was included in the sale. See *infra* ¶ 75 (record notice of exclusion of cell tower lease in Viola Farm warranty deed is imputed to buyer). Brian and Rebecca failed to include language in the contract concerning the cell tower lease. Brian knew Lori needed to sign the contract because she was a joint tenant but continued without her signature. This was all done before Carmen was involved in this matter. As a result, Brian and Rebecca cannot claim that had the undisclosed risk been known, they would not have accepted the risk and consented to the recommended course of action. There was no recommended course of action and their pleadings

- 15 -

and deposition testimony make clear that they were aware of the risks. The circuit court properly found Brian and Rebecca could not establish proximate cause.

¶ 48    Another argument advanced is that Carmen's failure to request a copy of the underlying contract before effectuating the property transfers was "legally deficient" and "incompetence." Even if Carmen was in possession of the contract, this would not change our finding. The contract contained no mention of the cell tower lease and would not have alerted Carmen to Brian and Rebecca's assumption they were to receive it. See *Majumdar v. Lurie*, 274 Ill. App. 3d 267, 271 (1995) (noting attorneys need not be clairvoyant when discharging their legal obligations).

¶ 49    Rounding out the arguments under this heading, Brian and Rebecca contend Carmen was conflicted when he took on Neal as a client and that Carmen did not follow the formalities laid out in the LLC operating agreement or the land trust. Having found Carmen was not the proximate cause of Brian and Rebecca's damages, the contention that he was conflicted when he took Neal on as a client is without merit. See *Owens*, 316 Ill. App. 3d at 353 ("The mere fact that an attorney may have violated professional ethics does not, in and of itself, give rise to a cause of action for damages."). We further find that the contentions that Carmen failed to follow the formalities of the LLC and the land trust offers no relief. Even if the formalities of these two legal entities were followed, Viola Farm was not a property owned by the LLC or the land trust and compliance would not have revealed the assumption by Brian and Rebecca that they were to receive the interest in the cell tower lease when the contract was silent on that point.

¶ 50    Accordingly, the circuit court did not err by granting judgment in favor of Carmen.

¶ 51                    B. Claims Against Neal, Lori, and Landmark

- 16 -

¶ 52    Brian and Rebecca contend summary judgment in favor of Neal and Lori was improper on their breach of contract and common law fraud claims. They also allege the lower court erred by granting summary judgment in favor of Landmark on the conspiracy claim.

¶ 53                                    1. *Breach of Contract*

¶ 54    Brian and Rebecca argue that the circuit court's grant of summary judgment on their contract claims was improper owing to the fact that there are still genuine issues of material fact left unresolved. Specifically, the meaning of the $600,000 value attached to Viola Farm. Further, they argue that Neal's agreement to the $600,000 value severed the joint tenancy as to the cell tower lease, citing *Ennis v. Johnson*, 3 Ill. 2d 383 (1954). The circuit court concluded there was no enforceable contract to sell the lessor's interest in the cell tower lease relying on *Dineff v. Wernecke*, 27 Ill. 2d 476 (1963), and *Hosty v. Kroupa*, 117 Ill. App. 2d 419 (1969).

¶ 55    "It is well established that to prevail on a breach of contract claim, a plaintiff must plead and prove that:  (1) a contract exists,  (2) plaintiff performed his obligations under  the contract, (3) defendant breached the contract, and (4) plaintiff sustained damages as a result of defendant's breach." *International Supply Co. v. Campbell*, 391 Ill. App. 3d 439, 450 (2009).

¶ 56    Further, in order to be enforceable under Illinois's statute of frauds, a contract for the sale of land must be in writing, contain the essential terms of the agreement, and be signed by the parties to the contract. 740 ILCS 80/2 (West 2018).

¶ 57    We first dispose of plaintiffs' contention that genuine issues of material fact precluded summary judgement. The circuit court found that plaintiffs could not prove an essential element of their claim. Namely, that a valid contract existed between the parties for the transfer of the cell tower lease. Given that Brian and Rebecca failed to establish an element of their claim, pointing to issues of material fact regarding other elements offers them no relief. See *supra* ¶ 45.

- 17 -

¶ 58    We agree that the rulings in *Dineff* and *Hosty* require judgment in favor of Neal and Lori in this matter. In *Dineff*, the defendant owned a piece of property in joint tenancy with his wife and entered into an agreement to sell the property without his wife's consent. *Dineff*, 27 Ill. 2d at 479. Our supreme court stated that without a written document authorizing one tenant to act on the behalf of the other, there was no legal authority to convey the nonagreeing tenant's interest under the statute of frauds. *Id.* at 481. Moreover, because both joint tenants did not sign the contract conveying the property to plaintiff, there was no enforceable contract. *Id.* at 482.

¶ 59    The court in *Hosty*, relying on *Dineff*, reached the same conclusion, finding "without the signature of both owners, there can be no contract and, likewise, no breach to support an action for damages." *Hosty*, 117 Ill. App. 2d at 424.

¶ 60    The fact that plaintiffs contend it is still unknown what was meant by the $600,000 language in the contract is immaterial. The contract was unenforceable as to the cell tower lease, owing to the fact that the cell tower lease was held in joint tenancy and Lori never signed the contract. In addition to the absence of Lori's signature, Brian and Rebecca admitted in their depositions that neither Neal nor Lori promised to convey the cell tower lease or even discussed the cell tower lease.

¶ 61    Brian and Rebecca also contend that Neal severed the joint tenancy by agreeing to the $600,000 value contained within the contract relying on *Ennis*. In *Ennis*, the lower court ordered defendant to convey his interest in a piece of property pursuant to an alleged contract to convey the entire property. Defendant held the property in joint tenancy with his wife. In a direct appeal to the Illinois Supreme Court the decision was affirmed. The court found "[a] joint tenancy, even though the joint tenants are husband and wife, is severed when one joint tenant conveys his or her interest to a stranger." *Ennis*, 3 Ill. 2d at 387. The court also found that the contract which relief

was granted under was not so vague or indefinite to force the lower court to engage in conjecture. *Id.* at 388.

¶ 62       We find *Ennis* distinguishable. The relief sought in *Ennis* and that sought in this matter are completely divergent. Brian and Rebecca did not seek specific performance to compel the transfer of a one-half interest in the cell tower. They sought legal damages for the entire cell tower lease. As Neal and Lori point out, the fact that Brian and Rebecca sought the entire lease distinguishes this matter from *Ennis*. Just as the court in *Wiggins v. Morgan*, 55 Ill. App. 3d 198, 202 (1977), we reject the argument based on *Ennis* where the evidence shows the purchaser intended to receive the entire interest, not just the signatory's. Suffice it to say, requesting legal damages for the entire cell tower lease and then arguing Neal has severed his interest in said lease by citing to a case allowing specific performance under an unequivocal contract is befuddling.

¶ 63       Additionally, the contract at issue here is "vague" and Brian admits that fact. Even if Lori had signed the contract, there is no mention of a cell tower lease anywhere in the contract. See *Thompson v. Gordon*, 241 Ill. 2d 428, 449 (2011) ("[T]here is a presumption against provisions that easily could have been included in a contract but were not."). There was also no discussion of an assignment of the cell tower lease between the parties. The failure to agree upon or even discuss a material term evidences a lack of mutual assent. See *Mannion v. Stallings & Co., Inc.*, 204 Ill. App. 3d 179, 186 (1990) (noting in a breach of contract action, the plaintiff must establish an offer and acceptance, consideration, definite and certain terms of the contract); see also *Delcon Group, Inc. v. Northern Trust Corp.*, 187 Ill. App. 3d 635, 643 (1989) ("[O]ne of the elements essential to the formation of a contract is a manifestation of agreement or mutual assent by the parties to its terms, and the failure of the parties to agree upon or even discuss an essential term of a contract may indicate that the mutual assent required to make or modify a contract is lacking."). Brian and

- 19 -

Rebecca's assumption that they would receive the lease simply because they believed the cell tower was located on Viola Farm does not make it a term within the contract.

¶ 64        Brian and Rebecca go on to advance a convoluted argument claiming their full performance makes the statute of frauds inapplicable in this matter.

¶ 65        The full performance doctrine is distinct from the part performance doctrine. *American College of Surgeons v. Lumbermens Mutual Casualty Co.*, 142 Ill. App. 3d 680, 700 (1986). Where a contract or agreement is fully performed by the party seeking to enforce it the statute of frauds will not apply as a defense. *Ropacki v. Ropacki*, 354 Ill. 502, 508 (1933). The rationale for this doctrine is that when one party fully performs his or her obligations, allowing the other party to avoid its corresponding duties under the agreement while enjoying the benefits and asserting the defense of the statute of frauds would be unfair. *Meyer v. Logue*, 100 Ill. App. 3d 1039, 1043-44 (1981).

¶ 66        There are deficiencies with the claim of full performance that cannot be overcome. Although Brian and Rebecca argue the performance doctrine would take the contract with Lori out of the statute of frauds, it is not clear to what contract they are referring. Lori never signed the contract. Brian and Rebecca both admit in their depositions that Lori promised them nothing. What we are asked to do is to create an agreement out of thin air between Brian, Rebecca, and Lori. We decline the invitation to do so.

¶ 67        Further, the full performance argument disregards the fact that Brian and Rebecca did not transfer the one-half grain site to Neal. Partial performance does not allow a party to avoid the defense of the statute of frauds when seeking legal damages. *Phillips v. Britton*, 162 Ill. App. 3d 774, 782 (1987). Brian's alleged delegation to Doug of the responsibility to transfer the one-half grain site to Neal does not absolve Brian of his responsibilities under the contract. See Restatement

(Second) of Contracts § 318 (1981) ("Unless the obligee agrees otherwise, neither delegation of performance nor a contract to assume the duty made with the obligor by the person delegated discharges any duty or liability of the delegating obligor.").

¶ 68        Leaving no stone unturned, Brian and Rebecca also argue that Lori fully performed her obligations under the agreement by signing the warranty deed to complete the conveyance of Viola Farm. This, they argue, is sufficient to save the agreement from the statute of frauds. Again, what agreement they are referring to on the part of Lori is unclear. Also, maintaining that Lori fully performed the agreement is curious because if Lori fully performed her obligations under the agreement, then why is she being sued for breach? Further, when Lori signed the warranty deed that excepted the cell tower lease, this only crystalized her intent to not transfer the cell tower lease and brought the merger by deed doctrine into play. See *Czarobski v. Lata*, 227 Ill. 2d 364, 369-70 (2008) (noting under the doctrine of merger by deed, all prior agreements between a buyer and a seller are merged in the deed upon its acceptance and the deed supersedes the provisions of the real estate contract and becomes the only binding instrument between the parties). However, we need not address the merger by deed doctrine given the analysis above. Brian and Rebecca's argument on this point is without merit.

¶ 69        Accordingly, the circuit court did not err in ruling in favor of Neal and Lori on the breach of contract claims.

¶ 70                              2. *Common Law Fraud and Conspiracy*

¶ 71        Brian and Rebecca again argue that genuine issues of material fact precluded the grant of summary judgment in favor of defendants on their common law fraud and conspiracy claims. They go on to recount the scheme, alleged knowledge of certain defendants, and alleged fiduciary duties of certain defendants that made summary judgment improper below.

¶ 72    To establish fraud, a plaintiff must prove: "(1) a false statement of material fact, (2) knowledge or belief of the falsity by the party making it, (3) intention to induce the other party to act, (4) action by the other party in reliance on the truth of the statements, and (5) damage to the other party resulting from such reliance." *Board of Education of City of Chicago v. A C & S, Inc.*, 131 Ill. 2d 428, 452 (1989). No action for fraud exists where defendants personally made no representations to plaintiff. See *Seefeldt v. Millikin National Bank of Decatur*, 154 Ill. App. 3d 715, 720-21 (1987). "[T]he representations must be viewed in the light of all the facts of which the party injured had actual knowledge and also such as he might avail himself of by the exercise of ordinary prudence." *Halla v. Chicago Title & Trust Co.*, 412 Ill. 39, 47 (1952). Fraud does not exist where the parties possess equal knowledge or the means to obtain equal knowledge. *Seefeldt*, 154 Ill. App. 3d at 719.

¶ 73    Again, we first dispose of the argument that genuine issues of material fact prevented summary judgement on the fraud claim. We find this argument unavailing for the same reason we disregarded it in the breach of contract claim, Brian and Rebecca have not established every element of fraud. See *supra* ¶ 45. Namely, they cannot allege a false representation or reliance.

¶ 74    Regarding Neal and Lori, the record is clear that neither Neal nor Lori made any representations about the cell tower to Brian or Rebecca. In Brian's first deposition, he stated that he never talked to Neal about the cell tower before receiving the deed to Viola Farm. In his second deposition, he claimed to only have talked to him once briefly about the lease before receiving the deed. That conversation consisted merely of Brian asking Neal how much he received from the lease to which Neal responded, "not that much." Brian had no idea what the terms of the cell tower lease were. He only assumed he would receive the lease because the tower was located on Viola

- 22 -

Farm, even though he knew the lease could be severed from the land from his dealings with a company trying to sever a wind turbine lease from one of his own properties.

¶ 75    Further, an inspection of the Viola Farm warranty deed would show that the cell tower lease was excepted from the conveyance of the property to Neal and Lori. See *Eckland v. Jankowski*, 407 Ill. 263, 267 (1950) (noting it is the duty of a purchaser of land to examine the public record and despite a failure to do so is chargeable with notice of whatever is documented); see also *Bundesen v. Lewis*, 368 Ill. 623, 633 (1938) (noting even if representations were made an individual will be charged with knowledge of the truth when ample opportunity to ascertain that truth is available and the individual does not avail themselves to the means of knowledge available); *Seefeldt*, 154 Ill. App. 3d at 719 (noting an individual entering a transaction ignorant of available information cannot claim that they have been deceived by another); *Bezin v. Ginsburg*, 59 Ill. App. 3d 429, 438-39 (1978) (noting that where an allegedly defrauded party unreasonably fails to take even the most rudimentary precautions before entering into a transaction, as a matter of law, the party is precluded from prevailing on a fraud theory).

¶ 76    If Brian and Rebecca exercised even minimal due diligence in this transaction, they would have discovered facts of public record that served to put them on guard relating to the transfer of the cell tower lease. We agree with the circuit court that the undisputed facts show that Neal and Lori did not make any false statements to Brian and Rebecca regarding the cell tower lease.

¶ 77    Instead of pointing this court to representations made by Neal and Lori, Brian and Rebecca allege that by signing the contract, Neal adopted the representations therein. Also, that Neal and Lori undertook a "course of conduct" that was fraudulent without identifying specific representations. These arguments are unpersuasive. See *Douthit v. Swiney*, 310 Ill. 180, 184 (1923) ("Mere commendation or expression of opinion cannot be made the basis of a charge of fraud, and

- 23 -

as a general rule a false statement of value cannot be made the basis of such a charge."). Brian and Rebecca drafted the contract, the $600,000 figure was their representation, and there is no reference in the contract to a cell tower lease. The parties also acknowledge there was no oral agreement regarding the cell tower lease. It is well established, that "[n]o action for fraud exists where defendants personally made no representations to plaintiff." *Lindy Lu LLC v. Illinois Central R.R. Co.*, 2013 IL App (3d) 120337, ¶ 26.

¶ 78    Having found Neal and Lori made no representations, it follows that Brian and Rebecca could not have relied on any statements from Neal and Lori about the cell tower lease. However, Brian and Rebecca contend that the circumstances surrounding the backdating of documents from Landmark to Neal for the assignment of the lease "more than satisfied the threshold of pleading fraud." We disagree. Brian and Rebecca were completely unaware of the option agreement between Neal and Landmark. Being unaware of the agreement, it was impossible for them to rely on it when entering into the agreement for Viola Farm.

¶ 79    Accordingly, the common law fraud claim for fraudulent misrepresentation must fail.

¶ 80    Brian and Rebecca also allege that Neal had a fiduciary duty to disclose his dealings with Landmark concerning the cell tower lease. Essentially, they argue that by reference they pled that Neal owed them a fiduciary duty by his involvement in the LLC, and the informal grain partnership which is also referenced at times as a joint venture. The difference between a partnership and joint venture is immaterial in this instance, as courts treat the fiduciary duties created therein the same. *Ambuul v. Swanson*, 162 Ill. App. 3d 1065, 1070 (1987) ("The relationship between joint venturers, like that existing between partners, is fiduciary in character and imposes upon the participants an obligation of loyalty and good faith in their dealings with each other with respect to the enterprise."). A fiduciary relationship exists between partners and embraces all matters relating to

the partnership business. *Bakalis v. Bressler*, 1 Ill. 2d 72, 79 (1953); *Couri v. Couri*, 95 Ill. 2d 91, 98 (1983).

¶ 81 We note that while Brian and Rebecca claim they sufficiently pled this accusation, they include no citation to the record where these pleadings can be found. After reviewing the pleadings, there is no mention of a fiduciary duty that Neal owes to Brian and Rebecca either in the "General Allegations" or in the text of the fraud claim. Brian and Rebecca failed to raise this argument until their motion to reconsider. Given the failure to timely advance this argument, it has been forfeited. See *Barth v. Kantowski*, 409 Ill. App. 3d 420, 426 (2011) ("[A] litigant may not raise a new legal theory for the first time in a motion to reconsider.").

¶ 82 Even absent forfeiture and given the proper establishment of an informal grain partnership or joint venture below, the lessor's interest in the cell tower lease was a matter outside of that partnership or joint venture. See *Bakalis*, 1 Ill. 2d at 79 (noting a fiduciary relationship embraces all matters reasonably relating to the partnership); *Yokel v. Hite*, 348 Ill. App. 3d 703, 710 (2004) ("the fiduciary relationship that accompanies a joint venture applies only to matters within the scope of the joint venture"). The same reasoning applies to the LLC. Further, Neal was not a member of the LLC. The receipts for the cell tower lease went to Neal and Lori individually and not the grain operation or LLC.

¶ 83 Having found that there is no cause of action against Neal and Lori for fraud, Brian and Rebecca's conspiracy claim against Landmark necessarily fails. See *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 63 (1994) (stating civil conspiracy is not a standalone cause of action but instead a derivative claim of a tortious act committed in furtherance of the agreement).

¶ 84 Accordingly, the circuit court did not err by ruling in favor of Neal, Lori, and Landmark on the common law fraud and conspiracy claims.

- 25 -

3. *Consumer Fraud and Deceptive Practices Act*

¶ 86         Brian and Rebecca also contend that the circuit court erred as a matter of law in dismissing their claim under the Act (815 ILCS 505/1 *et seq.* (West 2018)). In support of their contentions, they direct this court's attention to the decision in *Benzakry v. Patel*, 2017 IL App (3d) 160162. We review judgment on a motion to dismiss *de novo*. *Whipple v. Village of North Utica*, 2017 IL App (3d) 150547, ¶ 22.

¶ 87         In order to succeed on a claim under the Act, the plaintiff must show " '(1) a deceptive act or practice by the defendant, (2) the defendant's intent that plaintiff rely on the deception, (3) the occurrence of the deception during a course of conduct involving trade or commerce, (4) actual damage to the plaintiff [and] (5) proximately caused by the deception.' " *Benzakry v. Patel*, 2017 IL App (3d) 160162, ¶ 81 (quoting *Ramirez v. Smart Corp.*, 371 Ill. App. 3d 797, 806 (2007)).

¶ 88         Although Brian and Rebecca rely on *Benzakry* for support, we find it distinguishable from this matter. In *Benzakry*, multiple misrepresentations were made to the plaintiff via an advertisement for a commercial property listed on a real estate website, LoopNet. *Benzakry*, 2017 IL App (3d) 160162, ¶ 15. A panel of this court found that the "defendants engaged in deceptive acts when they knowingly misrepresented information in their advertisement and in their e-mails to Benzakry." *Id.* ¶ 82. Brian and Rebecca point us to no such misrepresentations in this matter.

¶ 89         The second amended complaint averred that "defendants' acts of misrepresenting the value of the 64 acre Viola farm premises and concealing from [Brian and Rebecca] the January 24, 2015, assigned Cellco Wireless Tower Lease and Easement to Landmark *** were deceptively intended to intentionally convert and deprive [Brian and Rebecca] of receipt of that lease/contract benefit as part of the represented value of the 64 acre Viola farm ***." This statement ignores the undisputed facts that (1) Brian and Rebecca drafted the contract and (2) Brian stated in his

deposition that he inflated the value of Viola Farm to induce Neal to sign the contract. Given that Brian and Rebecca assigned the $600,000 value to Viola Farm, the argument that Neal or Lori made this representation to them is disingenuous at best. As laid out above, Brian and Rebecca failed to make an inquiry into the cell tower lease. Instead, they simply assumed its inclusion. See *Seefeldt*, 154 Ill. App. 3d at 719 ("A person may not enter into a transaction with their eyes closed to available information and then charge he has been deceived by another.").

¶ 90        Accordingly, the circuit court did not err in dismissing the consumer fraud claim.

¶ 91                                C. Claims Against Doug

¶ 92                                1. *Fraud and Conspiracy*

¶ 93        In their fraud claim, Brian and Rebecca contend that Doug breached his fiduciary duty by failing to notify them of the assignment of the cell tower lease to Landmark. Doug responds, stating that Brian and Rebecca throughout the pendency of this litigation have made conclusory arguments while failing to provide factual or legal support. We have previously laid out the law for fraud, conspiracy, and fiduciary duties in a partnership or joint venture. See *supra* ¶¶ 72, 80, 82, 83. We review the dismissal of the fraud and conspiracy claims against Doug *de novo*. *Whipple*, 2017 IL App (3d) 150547, ¶ 22.

¶ 94        For the same reasons we found Brian and Rebecca's fraud claim failed against Neal and Lori, it also fails against Doug. Brian and Rebecca failed to exercise even a modicum of due diligence before entering into the transaction for Viola Farm. A review of the warranty deed of the property would have put them on notice the cell tower lease was not included with the land. See *Seefeldt*, 154 Ill. App. 3d. at 719 (noting an individual entering a transaction ignorant of available information cannot claim that they have been deceived by another); *Bezin v. Ginsburg*, 59 Ill. App.

3d at 438 (accord). Additionally, as explained above, the cell tower lease was not within the scope of the LLC or the grain operation.

¶ 95    Brian and Rebecca allege that Doug made the representation that Viola Farm was worth $600,000 by signing the contract. We find this contention as unpersuasive when alleged against Doug as it was against Neal and Lori. Brian and Rebecca drafted the contract and the $600,000 was their representation of the value of Viola Farm. As with the conspiracy claim against Landmark, the failure of the underlying tort claims necessitates a finding in Doug's favor on the conspiracy claim. *Supra* ¶ 83.

¶ 96                              2. *Third Party Complaint*

¶ 97    Brian and Rebecca, as well as Doug, argue the propriety of the lower court's rulings concerning the third-party complaint. However, we find we need not reach this issue on appeal.

¶ 98    Third-party actions are premised on derivative liability; therefore, the majority of third-party complaints are based on claims for indemnification or contribution. *Guzman v. C.R. Epperson Construction, Inc.*, 196 Ill. 2d 391, 399 (2001). "In other words, the liability of the third-party defendant is premised on the liability of the third-party plaintiff to the original plaintiff." *Schulson v. D'Ancona & Pflaum LLC*, 354 Ill. App. 3d 572, 576 (2004).

¶ 99    Neal brought his counterclaim which precipitated the filing of the third-party claim by Brian and Rebecca. The lower court allowed Neal to voluntarily dismiss his counterclaim without prejudice thereby removing the derivative liability the third-party plaintiffs faced. In the absence of this liability, these claims are moot. Neal's counterclaim was voluntarily dismissed without prejudice and may be litigated at a later date.

¶ 100    Accordingly, we need not address the arguments regarding the third-party complaint.

¶ 101                              III. CONCLUSION

¶ 102     For the foregoing reasons, we affirm the judgment of the circuit court of Henry County.

¶ 103     Affirmed.